**In re KULICKE AND SOFFA INDUSTRIES, INC. SECURITIES LITIGATION.**

**Master File No. 86–1656.**

United States District Court, E.D. Pennsylvania.

Sept. 9, 1988.

---

Eugene A. Spector, John F. Innelli, Robert M. Roseman, Mark S. Goldman, Bernard M. Gross, Deborah R. Gross, Philadelphia, Pa., Bruce E. Gerstein, Scott W. Fisher, New York City, for plaintiffs.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Plaintiffs purchased shares of the common stock of Kulicke & Soffa, Inc. ("K & S") in 1984 and 1985.[1] They each brought securities actions against K & S, C. Scott Kulicke, chairman and chief executive officer of K & S, and several members of the K & S board of directors, alleging violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and rule 10b-5. Their actions were consolidated and plaintiffs moved for class certification. Defendants responded to this motion and concurrently moved for summary judgment. After submitting numerous briefs, documents, affidavits, and deposition testimony, the parties agree the motion for summary judgment is ripe for disposition.[2]

K & S develops and manufactures equipment, tools, and accessories used in the assembly of semiconductor devices. Because of its dependence on the semiconductor market, as that market goes, generally so goes K & S. For its fiscal year ending on September 30, 1984, K & S enjoyed record sales of $119,000,000 and record net income of $14,123,000. For fiscal year 1985, K & S along with the rest of the semiconductor industry experienced a downturn in profitable business, and although reporting that sales were approximately $125,000,000, it had a net loss of $500,000. It is the downturn in 1985 that is the genesis of this action. Plaintiffs allege that defendants made statements, projections, and forecasts in late 1984 and 1985 regarding sales and earnings for fiscal 1985 that were false and misleading as part of a scheme to raise or maintain the price of K & S stock at a time Scott Kulicke was

---

1. Plaintiff Allan Lisse purchased shares of K & S stock in August, 1982, August, 1984, and February, 1985. Plaintiff Robert Zlotnick purchased K & S stock on March 26, 1985, which he sold on June 15, 1985.

2. In March, 1987, I heard oral argument on both the motions for summary judgment and class certification at which time counsel for plaintiffs opposed disposition of the motion for summary judgment on the ground substantial discovery was outstanding. Defendants challenged this proffer as insufficient to satisfy rule 56(f) of the Federal Rules of Civil Procedure. *See, e.g., Hancock Industries v. Schaeffer,* 811 F.2d 225 (3d Cir.1987). Subsequently, plaintiffs supplemented the record with additional evidence. During oral argument on May 3, 1988, both sides agreed to a deadline for submission of briefs and evidence at which time the record would be complete. Thus, the questions of adequate discovery and compliance with rule 56(f) are moot.

selling it as executor and residual beneficiary of his mother's estate. The primary statement challenged by plaintiffs was a forecast by Scott Kulicke that sales for K & S would exceed $180 million in 1985 with an even greater increase in earnings.

Despite plaintiffs' protestations to the contrary,[3] their claims principally involve defendants' liability for making forecasts and projections. Before looking at each alleged misrepresentation, it is useful to set forth the applicable standards of liability.

■ To state a claim under section 10(b) and rule 10b–5, plaintiffs must prove that defendant made (1) a false or misleading representation of (2) a material (3) fact, (4) defendants' knowledge of its falsity or recklessness as to its truth and their intention that plaintiffs rely on it, (5) plaintiffs' reasonable reliance on the representation, and (6) their resultant loss. *Basic Inc. v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir.1988). The Third Circuit has held that a forecast or opinion is actionable as an untrue statement if it is made without a genuine belief or reasonable basis[4] and if made " 'with reckless disregard for its truth or falsity' or with a lack of 'genuine belief that the information disclosed was accurate and complete in all material respects.' " *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.) (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979)), *cert. denied sub nom., Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). The court further stated

> when a representation is made by professionals or 'those with greater access to information or having a special relationship to investors making use of the information', there is an obligation to disclose data indicating the opinion or forecast may be doubtful ... When the opinion or forecast is based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may 'support[ ] an inference that when [the defendant] expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.'

766 F.2d at 776 (citations omitted).

In addition to a duty to disclose information adversely affecting a forecast, a person who makes a material representation owes a duty to correct the statement in a timely manner if it "becomes materially misleading in light of subsequent events."[5] *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985).

■ One final point generally applicable to plaintiffs' claims concerns defendants' duty to disclose public information. Plaintiffs assert that during 1984 the book-to-bill ratio for the semiconductor industry as re-

---

**3.** During oral argument, counsel characterized this action as more than a "forecast case" because certain challenged statements by defendants used the word "anticipating" and because some statements were directed to K & S shareholders. There is no reason, however, why either fact should change the future-looking nature of the statements in question. *See e.g., Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.) ("language of expectation, of anticipation, and of possibilities recognizes the imponderable influences of complex variables in a fast-changing field."), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977).

Previously, plaintiffs also alleged an actionable misrepresentation as to the announcement of an increased dividend and the promotion of various officers, in part, to meet continued growth. It is undisputed that an increased dividend was paid and that promotions were made; thus the only arguable false or misleading statement is the prediction of future growth which falls in the category of forecasts.

**4.** Conversely, " 'a reasoned and justified statement of opinion, one with a sound factual or historical basis is not actionable.' " *Eisenberg,* 766 F.2d at 766 (quoting *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 490 (9th Cir.1974)).

**5.** An "omitted fact" is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). This standard applies whether or not defendants have profited. *Basic*, 108 S.Ct. at 988 n. 18.

ported by the Semiconductor Industry Association ("SIA"),[6] dramatically declined signalling a contraction in the semiconductor industry. In the amended consolidated complaint, plaintiffs allege the following:

22. In spite of and in direct contradiction to the information on the semiconductor industry as a whole, the Company continued to project optimism about its anticipated performance without any cautionary disclosure regarding the impact the downturn in the semiconductor industry was expected to have on K & S's earnings in 1985

....

35(a) ... K & S failed to disclose that beginning in January of 1984, the semiconductor industry began a prolonged slump which became severe by October and November, 1984, and which has continued into 1985....

It is clear that defendants owed no duty to disclose information already available to the public which is part of the total mix of information available to the reasonable investor. *See e.g., Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir.1988); *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275 (2d Cir. 1975); *In re Apple Computer Securities Litigation,* 672 F.Supp. 1552 (N.D.Cal. 1987); *Beissinger v. Rockwood Computer Corp.,* 529 F.Supp. 770, 781 (E.D.Pa.1981). This principle is particularly applicable where, as here, plaintiffs employ the fraud-on-the-market theory to prove reliance since that theory is premised on the principle that all available public information is incorporated and reflected in the market price of stock traded in a well-developed, impersonal market. *See Levinson v. Basic,* 108 S.Ct. at 989–90; *Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986). Thus, defendants had no duty to disclose a downturn in the semiconductor industry except as it directly affected their forecasts and projections for K & S.

I shall now review the specific misrepresentations and omissions alleged by plaintiff to determine whether there exist any genuine issues of material fact. As recently reiterated by the Third Circuit, "[a]n issue is genuine only if a reasonable jury, considering the evidence presented could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

I. Pre–October 1984 Statements

Plaintiffs focus most of their attack on statements made after October, 1984; however, they also challenge the following statements made during the summer of 1984 as materially false or misleading:

1. Shareholders' Report for the third quarter ending June 30, 1984—reporting record sales and profits for the third quarter and predicting even higher sales and profits for the fourth quarter.

2. Form 10–Q filed with the SEC on or about August 17, 1984—noting increased sales and profits for the third quarter "primarily due to increased unit shipments ... resulting from increased demand for integrated circuits which our customers produce ... sales and earnings for both the three and nine month periods ended June 30, 1984 were record highs for the Company." Consolidated Amended Complaint, ¶¶ 22(a), 22(b).

Plaintiffs have failed to point to any evidence that these statements were false or misleading. First, the prediction of higher profits and sales in the fourth quarter of fiscal 1984 were accurate. Second, plaintiffs have not shown why forecasts of increased growth were false or inaccurate other than by pointing to the declining book-to-bill ratio. As already noted, however, this information was available to the investing public and absent a direct impact on K & S business, which has not been shown, defendants were under no duty to disclose the book-to-bill ratio. Moreover, while plaintiffs construe the lowering book-to-bill to sound an automatic death knell for the semiconductor industry, published articles submitted by defendants from this time period reveal that forecasters still predicted increased sales for the fourth quar-

---

**6.** The book-to-bill ratio measures new orders to actual shipments of semiconductors.

ter of 1984 (first fiscal quarter of 1985 for K & S) and attributed the lowering book-to-bill to increased production rather than decreased orders. See Appendix to Defendants Motion for Summary Judgment, Exhibit 4 (publications from *Business Week*, *The Philadelphia Inquirer*, and the *Wall Street Journal*). Thus, based upon the evidence of record, a reasonable juror could not find that these statements were false or misleading, i.e., made without a genuine belief or reasonable basis.

## II. October, 1984, and November, 1984, Statements

In a press release dated October 9, 1984, K & S announced that the quarterly dividend would be doubled from 2 cents to 4 cents per share.[7] This release contained the following statement by Scott Kulicke:

> The Company will report record sales and earnings for the fiscal year ended September 30, 1984 and our expectation for the next fiscal year is for further significant growth in both sales and earnings ... the increase in our dividend reflects our accomplishments to date and our confidence in the future.

On October 30, 1984, Scott Kulicke sent a letter to K & S shareholders, the substance of which was published by the Wall Street Journal on November 5, 1984. The letter reported the increased dividend, the unaudited sales figures for fiscal 1984 of $119 million and earnings per share of $1.75[8] as well as several personnel changes to manage K & S through its "next round of growth." Scott Kulicke then made the following statement which is the linchpin of plaintiffs' action:

We believe that 1985 will be an excellent business year in which there is continued significant growth in the quantity of semiconductor devices produced by our customers, so that they will add to and upgrade their assembly capacity. Based on that outlook with our expectation of at least maintaining our dominant market share, we are anticipating fiscal sales to exceed $180,000,000, a 50% increase over fiscal 1984, with an even greater growth in earnings per share.[9]

As noted earlier, the numerical projections were not met as fiscal year 1985 sales only reached $125 million with a net loss of $500,000 as compared with net income of $14 million in fiscal 1984. Nevertheless, defendants contend that in October, 1984, the forecasts were not false or misleading under the *Eisenberg* standard.

Scott Kulicke suggested and made the numerical forecasts. He averred that they were based on four factors: First, the company's Key Data Sheets for the end of fiscal 1984 recorded that almost half of the projected sales were already "booked" or "entered but not booked."[10] Second, the forecasts were based upon internal sales forecasts that, in turn, were based upon backlog and projections of future orders by K & S salesmen, taking into account the probabilities that the predicted orders would be booked. The October, 1984, four-quarter rolling budget forecast sales in excess of $200 million. Plaintiffs' Reply to Defendants' Response to Plaintiffs' Supplemental Memorandum, Exhibit D. Third, Scott Kulicke and Donald Van Luvanee, president of K & S, verified sales forecasts through personal contacts with customers and public announcements of new manufac-

---

7. The unaudited fourth quarter financial reports calculated primary earnings of 73 cents per share.

8. The K & S annual report disclosed that sales equaled $119,641,000 with net income of $14,123,000 as compared with sales of $67,314,000 and net income of $1,656,000 in 1983.

9. Plaintiffs also challenge an October 30, 1984, press release announcing that MacDonnell Roehm, Jr. had joined the board of directors and that his addition would help K & S meet the challenges presented by continued growth.

10. According to Robert Van Luvanee, president of K & S, and Martin Weiss, then vice-president and treasurer for K & S, "orders entered but not booked" historically became "orders booked", i.e. backlog, which would normally be shipped within six months. The September 28, 1984 Key Data Sheet listed $57,241,000 in "orders booked" and $29,360,000 in "orders entered but not booked" for a total of $86,608,000. On the October 26, 1984 Key Data Sheet, the total had increased to $94,700,000.

turing facilities. Fourth, the forecast was supported by independent forecasters who still predicted 1985 to be a growth year for the semiconductor industry, albeit less growth than 1984.

Scott Kulicke and Martin Weiss, former vice-president and treasurer for K & S, also testified that the earnings forecast was developed by analyzing earnings for the last two quarters of fiscal 1984 with the sales forecast for fiscal 1985 and projecting a reasonable rate of return on sales. *See also* October 15, 1987 affidavit of John Inelli, Esquire, Exhibit J (four-quarter rolling budget prepared on October 17, 1984, projected net income of $34,044,000 for fiscal 1985).

After reviewing the bases for the forecasts and the underlying data, I conclude that defendants have demonstrated that the October, 1984, forecasts were made with a genuine and reasonable belief. Moreover, plaintiffs have failed to show there is a genuine question of material fact that the forecasts were false or misleading or that defendants failed to disclose material information adversely affecting the forecasts. *Eisenberg*, 766 F.2d at 776.

Plaintiffs attack these forecasts on several fronts. First, they rely on the testimony of Martin Weiss to show the forecasts were false or misleading. He testified that in the fall of 1984 he had a feeling that the industry would experience a downturn. This perception was based upon his review of the sales call reports and a feeling that large orders were tougher to close. He could not specify, however, any definite factors indicating a downturn. Rather, as he stated, "[t]o me, it was like my antennae were starting to vibrate. It could have just

been the way, you know, a particular salesman wrote something, but it was more than one instance. I just didn't feel—didn't like how I was feeling when I was reading these things." He stated, however, that his reservations did not affect "orders booked" and "orders entered but not booked", and that the factors relied upon by Scott Kulicke supported the forecasts.

Plaintiffs also allege that the four-quarter rolling budget did not provide a reasonable basis for the forecast since the two outside quarters of the budget only provided a speculative prediction at best. Plaintiffs concede that the first two quarters were fairly accurate as they were primarily based upon "orders booked" and "orders entered but not booked." While I agree that the forecast for the latter quarters was conjectural, this uncertainty is the result of the general difficulty in rendering a year-long forecast rather than the result of any improprieties by defendants. This uncertainty is also obviously known to a reasonable investor or shareholder who interprets such a forecast. Here, the four-quarter budget appeared reasonable as of October 30, 1984, for the following reasons: "orders booked" and "entered but not booked" equaled $86 million on September 28, 1984 and $94.7 million on October 26, 1984, with sales of $4.8 million in October; sales had progressively increased since the second quarter of 1984; and the third and fourth quarter forecasts for fiscal 1985 were consistent with the increase. There is no evidence that prior to the end of October, orders had been dropped, cancelled, or otherwise altered to indicate a downturn in K & S business;[11] and while the four-quar-

11. Plaintiffs point to K & S' dealings with Amkor in an attempt to show a decline in K & S business. In March, 1984, K & S and Amkor reached an agreement whereby Amkor could purchase 500 K & S model 1482 wire bonders with a 180–day payment term. Despite plaintiffs' assertions to the contrary, it is clear that use of the full 180 days by Amkor does not create an inference that the order was soft nor does the failure of Amkor's July order to appear on the backlog for September 28, 1984, indicate a stretchout of its orders since orders for Amkor were backlogged from October, 1984, through December, 1984. *See* Plaintiffs' Reply to De-

fendants' Response, Exhibit I, and since a January 7, 1985, memorandum from Martin Weiss expressed concern with Amkor's account receivables balance which stood at $7.25 million on account of "significant shipments" which based upon order backlog would reach $12 million by February, 1985. *Id.,* Exhibit M.

Plaintiffs also argue that defendants were aware of a potential downturn in the industry as evidenced by two memoranda written by K & S employees in February, 1984, regarding the potential for double ordering by customers and excessive inventory. However, as plaintiffs

ter rolling budget forecast sales in excess of $210 million, this figure was lowered to $180 million for purposes of the public forecast.

Finally, plaintiffs point to the available public information, particularly the book-to-bill ratio and the October forecasts by two trade publications, In–Stat and VLSI Research, Inc. to cast doubt on the forecasts. While these reports do note a softening in the semiconductor industry for 1985, their forecasts portray a "growth recession." That is, growth in demand will range from 15–20 percent which when compared with the 55 percent growth in 1984, will have the appearance of a recession. VLSI predicted that equipment sales would increase 22.5 percent and that the semiconductor industry would spend 22.8 percent of sales on equipment, up from 18.6 percent in 1984. In response to the concern over the book-to-bill, In–Stat forecast 15 percent growth for 1985 which "would still suggest to us that this is still a strong and vital industry—and to those who suggested that the industry is in a recession, we say PSHAW!!!" Finally, even assuming no growth past the first quarter of 1985, sales based upon the first two quarters of fiscal 1985, which were based on "orders booked" and "orders entered but not booked," multiplied by two still exceeded the forecast of $180 million. Thus, as a matter of law, plaintiffs have failed to show there is a genuine question of fact about the October forecasts being false or misleading or that defendants failed to disclose private information bearing on the forecasts.

III.  Post October, 1984, Statements

Plaintiffs also allege that after October, defendants were obligated to correct the forecasts which had become materially misleading, see *Greenfield v. Heublein*, 742 F.2d at 758, and also made the following statements that were false and misleading:

1.  December 5, 1984, press release—reporting record earnings for fiscal 1984,

an 80 percent increase in sales, and order backlog equal to $57 million. Scott Kulicke also commented that "[w]e believe that fiscal year 1985 will be another banner year for Kulicke and Soffa. Our organization is stronger and more talented than ever and our product line continues to expand, with several new models scheduled for introduction in 1985."

2.  December 14, 1984, letter from Scott Kulicke contained in the K & S Annual Report—Looking ahead, we are projecting fiscal 1985 sales of $180,000,000, in spite of the current inventory correction our customers are experiencing. Our optimism stems from several factors, some of which are unique to the assembly segment of the semiconductor business.

Basic demand for semiconductors continues to grow, creating increased demand for our products. Utilization of existing assembly capacity is high, meaning little or no slack exists today to absorb this increasing demand.

Price cutting by our customers (which has already started) will inevitably further stimulate demand for semiconductors and, therefore, demand for our products.

This same price cutting, because of its impact on our customers' productivity, intensifies their need to replace existing capacity with the most cost-effective equipment available....

3.  February 12, 1985, press release—reporting first quarter sales of $41,738,000 and that the increase from the first quarter of fiscal 1984 reflects the growth in the market as well as K & S' increasing market share. The release also contained a statement by Donald Van Luvanee that:

The recent period of inventory correction among semiconductor makers and consumers left the industry unsettled. Customers tell us they are through the worst of the adjustment and expect to

themselves acknowledge, this information is only relevant if certain circumstances occur: cancellation of orders, double orders, "non-regular customer" orders, the lead time of competitors, and the market saturation level for the

product type its customers were manufacturing. Plaintiffs' argument is specious as there is no evidence that any of these facts occurred prior to October, 1984.

resume a more typical pattern of strong, controlled growth. Our backlog peaked in November ... and because of a decrease in our incoming order rate, has been declining since then. We expect this trend to reverse itself later this year. Contact with customers indicates that we can expect an increase in orders later in the year. We are, of course, still committed to achieving our aggressive sales target for the year although we recognize that we are, in part, dependent on our customer's capacity plans, which are being continually re-evaluated.

4. March 11, 1985, press release—containing a projection by Scott Kulicke that while 1985 sales would increase, they would be below the $180 million prior forecast. In explaining this change, the release stated: At the start of this fiscal year, the company's plan was based on customer feedback and assumptions of continuing growth of semiconductor unit volume. We knew at the time that our customers had an unusually large amount of semi-conductor inventory in the "pipeline" but believed that it was still relatively small compared to the total number of semi-conductor units required in 1985. While we expected a few months during which an inventory correction by our customers would result in softness in our order rate, we believed that our substantial backlog would be adequate to carry us through this period. It was against this set of assumptions that we predicted $180 million in sales for 1985 with pretax profits of about 20%.

It is now apparent that these assumptions were overly optimistic. The size of inventory, combined with slower-than-expected unit growth made it necessary to revise our estimates. We now expect our sales to turn up during the summer at the earliest. The uncertainty in this forecast reflects our customer's similar uncertainty about their business. Furthermore, in February we experienced unexpected order cancellations and delivery stretchouts as our customers adjusted to the magnitude of the inventory correction. These cancellations will have limited impact on sales in the second quarter and substantial impact in the third quarter.

That is why we now expect sales for this year to be significantly below the $180 million forecasted, but still above 1984's level of $119,641,000. Profitability will also be impacted, with pretax margins forecast to decline as our business slows up and our customers regroup.

■ Based upon my review of the evidence presented, I am skeptical of plaintiff's assertion that defendants either failed to correct the October 31 forecast or made additional erroneous forecasts. Nevertheless, my role, when ruling on defendants' motion for summary judgment, is not that of the trier of fact. Because I conclude that plaintiffs have demonstrated that genuine questions of material fact exist, I will deny defendant's motion as it relates to plaintiffs' post-October, 1984, allegations.

Several events occurred after October 31, 1984, which lead me to conclude that summary judgment is inappropriate. First, on November 8, 1984, Martin Weiss lowered the sales forecasts for the first quarter of fiscal 1985 by $3.9 million and also lowered predicted pre-tax earnings for this quarter by $2.1 million, a 20 percent reduction. This reduction was attributed to dropped sales. Defendants assert that this drop was due solely to Kulicke & Soffa operating at capacity; however, the testimony of Scott Kulicke and Martin Weiss, upon which they rely for this claim, is hazy at best. Moreover, I note that when the first quarter budget was revised, the lost sales were not moved forward to the second or any other quarter thus suggesting that the reduction may not have been solely because of capacity problems.

Second, on December 10, 1984, Intel Corporation, a major customer, told K & S representatives that it did not project a need for new machines any earlier than the first quarter of 1986, a fact that was confirmed by memorandum dated January 2, 1985. This information supported the predictions in published articles in December and January indicating that the semiconductor industry was facing massive inven-

tory build-ups and semiconductor companies would be cutting back on their production. In addition, as noted by Donald Van Luvanee in the February 12, 1985, release, order backlog peaked in November and progressively declined since that time.

Third, in early January, 1985, K & S adjusted its second quarter budget downward by 12.5 percent. By January 22, 1985, the four-quarter rolling budget for fiscal 1985 was lowered by $24 million from the October, 1984, forecast.

Finally, on January 28, 1985, Amkor Electronics provided K & S with a summary of its needs for 1985. While Amkor still expected delivery of 56 1482 wire bonders during 1985, it placed a hold on 65 of the wire bonders. It stated that this schedule matched requirements through the end of 1985. Amkor also referred to stretch-outs on several other orders of K & S equipment. On March 11, 1985, Amkor placed a hold on all of its orders.

As noted earlier in my discussion of the October 31, 1984, forecast, the first two quarters of the four-quarter rolling budget are the most accurate since "order backlog" and "orders entered but not booked" provide an accurate measure of the company's sales for the next six months. With respect to the latter two quarters, however, there is less certainty since order backlog does not extend this far. These facts, particularly the stretch-outs by Amkor, the statement by Intel that its needs for 1985 were met, and the decreasing backlog, coupled with the declining book-to-bill ratio and overall industry forecasts, placed a certain degree of uncertainty on the forecasts for the third and fourth quarters of fiscal 1985. Whether defendant should have disclosed this information before the March 11, 1985, press release and whether the prior releases provided adequate disclosure are genuine questions of fact. Moreover, the company's duty to disclose this information may be even greater since in his December 14, 1984, letter contained in the annual report, Scott Kulicke listed several factors supporting his belief that Kulicke & Soffa would continue to experience growth and would reach its sales forecasts despite inventory corrections by its customers. The trier of fact could reasonably find that disclosure of these positive factors would require defendant to disclose factors adversely affecting the forecast and indicating a decrease in business in the second half of fiscal 1985. Moreover, whether the omitted information is "material" under the *TSC Industries* standard is a question of fact. Thus, summary judgment is inappropriate.[12]

In conclusion, I hold that defendants have demonstrated, as a matter of law, that the October 31, 1984, forecast and all statements made prior to that date, had a reasonable basis and were accurate; therefore, I will preclude plaintiffs from basing their claims on defendants' conduct prior to November 8, 1984. I will deny defendants' motion as to the post-October 31, 1984, statements and as to whether they satisfied their duty to correct erroneous forecasts in a timely manner.[13]

12. Plaintiffs also allege that the March 11, 1985, public statement did not cure all previous misstatements or omissions because the sharp drop in profits was not fully disclosed until May 11, 1985, in the 10–Q report for K & S. In the March 11 release, Scott Kulicke did state that profits would be impacted with "pretax margins forecast to decline." I can not determine, at this time, whether this statement was sufficiently complete particularly since in my review of the exhibits presented in connection with the motion for summary judgment, I have not located the 10–Q report. In any event, I will permit plaintiffs to proceed with this theory at this time.

13. Defendants have also asserted that plaintiffs have not carried their burden of establishing scienter. Plaintiff's principal argument is that Scott Kulicke's actions were motivated by the selling of Kulicke & Soffa stock held by his mother's estate for which he was the executor and residual beneficiary. Scott Kulicke counters, however, that he did not control the day to day selling of the stock which had to be sold to satisfy the tax obligations of the estate. The parties have also vigorously disputed whether

---

an officer/director must disclose to the SEC sales by an estate for which he is the executor. I need not reach this corollary issue because the fact that Scott Kulicke knew the estate had to sell the stock of Kulicke & Soffa by a certain date irrespective of whether he in fact controlled the day to day selling decisions is sufficient to raise a question of fact as to scienter.