**In re TSENG LABS, INC. SECURITIES LITIGATION.**

Civil Action No. 93–2756.

United States District Court,
E.D. Pennsylvania.

March 19, 1996.

Stanley R. Wolfe, Jeffrey M. Krulik, Berger & Montague, P.C., Philadelphia, PA, Andrew N. Friedman, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Robert M. Wolff, Meredith, Cohen & Greenfogel, P.C., Philadelphia, PA, for Plaintiffs.

Jay A. Dubow, Wolf, Block, Schorr. and Solis–Cohen, Philadelphia, PA, H. Robert Fiebach, Cozen and O'Connor, Philadelphia, PA, for Defendants.

Nancy E. Stuart, Hoyle, Morris & Kerr, Philadelphia, PA, Evie C. Goldstein, Weil, Gotshal & Manges, New York City, for movants.

## MEMORANDUM

ROBERT F. KELLY, District Judge.

This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Tseng Labs, Inc. ("TLI") during the period of October 29, 1992 through May 21, 1993 (the "Class Period"). In their Consolidated Amended Complaint, Plaintiffs allege that TLI and certain of its officers and directors artificially inflated the price of TLI's stock by making false and misleading statements during the Class Period in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, Defendants' motion will be granted.

## I. FACTUAL BACKGROUND

Defendant TLI is a designer and supplier of semiconductor chips used to enhance the graphic quality of computer monitors. In late 1989, TLI introduced the ET4000 Super VGA chip (the "ET4000") which was marketed as an inexpensive, high-performance video chip. Sales of the ET4000 represented approximately 87 percent and 98 percent of TLI's revenues in 1991 and 1992 respectively. On September 21, 1992, TLI announced a new chip, the ET4000/W32 graphics accelerator ("W32"), which was designed to improve the performance of the computer operating system known as "Windows."

On October 29, 1992 (the first day of the Class Period) TLI issued a press release stating that it had achieved record earnings for the third quarter of 1992. TLI attributed these earnings to the continued dominance of its ET4000 chip and spoke about new orders ("design wins") for the ET4000 with two major computer manufacturers. TLI also announced that meaningful sales of the W32 were expected for the first quarter of 1993. On February 1, 1993, another press release was issued announcing that TLI had commenced "volume shipments" of the W32. Defendant Jack Tseng, President of TLI, stated in the release that TLI looked forward to "significant shipments" of the W32 beginning in the first quarter of 1993. Defendant John J. Gibbons ("Gibbons"), Vice–Chairman of TLI, also made statements regarding TLI's expectations for the W32. In an interview with Reuters news service on March 9, 1993, Gibbons was quoted as saying he "expected [TLI] to ship 1.2 million to 1.7 million of the new [W32] chips in the second quarter of 1993."

On May 19, 1993, representatives from IBM informed Gibbons that IBM was experiencing problems in their manufacturing facilities which would require a reduction in its need for the W32 until IBM's problems were resolved. Defendants then undertook a review to determine whether the delay by IBM would have a significant impact on TLI's second quarter earnings. Defendants also reviewed the status of W32 orders with other customers. Defendants concluded that there would be fewer orders and sales for the W32 in the second quarter than had previously been expected. Consequently, after the close of the stock market on May 21, 1993 TLI announced that its second quarter earnings would be "moderately below" the $.22 per share it had reported in the first quarter. This press release went on to say that the reduction in expected earnings was a result of delays being experienced by certain major computer developers and board manufacturers whose new systems used the W32. It

was further noted that revenues from sales of the W32 in the second quarter of 1993 would not be sufficient to offset the anticipated decline in revenues from the older ET4000.

On the first trading day after the May 21, 1993 announcement, TLI's stock opened at $12.875 per share which was $1.875 per share lower than the closing price of the previous trading day.[1] On the same day, the first class action against TLI was filed.

## II. STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Wisniew-*

*ski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir.1987).

## III. DISCUSSION

In order to establish a claim under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder,[2] a plaintiff must prove that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied;[3] and (5) that the plaintiff's reliance was the proximate cause of their injury. *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 487 (3d Cir.1994), *citing In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989).

### A. Defendants' Statements Concerning The ET4000

Plaintiffs allege that Defendants had anticipated a steep decline in ET4000 sales due to the introduction of the next generation of graphics chips and that this decline came to fruition in February 1993.[4] Plaintiffs argue that despite this knowledge, Defendants made misleading statements to the market beginning in February 1993 which led investors to believe that sales for the ET4000 would continue to be strong and would help drive earnings.[5] Plaintiffs point to four documents in which they claim Defendants made misleading statements about the ET4000. Defendants first argue that they

---

**1.** The closing price of TLI stock on May 24, 1993 was $13.00 per share.

**2.** Section 10(b) of the Exchange Act prohibits using "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

Rule 10b–5 makes it unlawful for any person to:
> (b) ... make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5.

**3.** In cases such as this where a plaintiff relies on the fraud on the market theory, actual reliance is met by a rebuttable presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

**4.** In January 1993 TLI shipped approximately 296,444 ET4000s and had 621,848 in orders. By February 1993, the number of orders for the ET4000 dropped to 335,355 with 320,039 being shipped. The number of ET4000 orders dropped again in March 1993 to 169,240 with the number shipped at 303,112. In April 1993 the number of orders was at 130,125 and the number shipped had dropped to 31,290. (Pls.' Chart, Ex. 49 of Pls.' Mem.).

**5.** By letter dated January 30, 1995, Plaintiffs' counsel withdrew all claims relating to the ET4000 from the beginning of the Class Period until February 1, 1993.

should be awarded summary judgment because Plaintiffs' purported damages are not based in any part upon the allegations related to the ET4000. Defendants also argue that each statement at issue reported accurate historical data relating to the ET4000 and that such statements cannot create liability for securities fraud as a matter of law.

The first statement Plaintiffs cite is contained in a press release dated February 10, 1993 in which TLI announced its financial results for 1992. In this release, TLI reported that the ET4000 had gained further market share and that the company was "particularly pleased that although the ET4000 is a relatively mature product in the marketplace, unit shipments of this product in the fourth quarter more than doubled the prior year's fourth quarter." (Ex. 47 of Pls.' Mem.). The release also stated that the "[b]acklog for the ET4000 remains strong going into 1993 as well." *Id.* Along these same lines, TLI's Form 10–K, which was filed with the Securities and Exchange Commission on March 31, 1993, referred to the ET4000's "strong market acceptance" in describing the basis for the previous year's revenues in comparison with those of 1991. (Ex. 2 of Pls.' Mem.).

Next, Plaintiffs cite an April 26, 1993 press release in which TLI reported its earnings for the first quarter of 1993. Here, TLI described how it attained record profits in the quarter and stated that such profits were attributable to initial sales of the W32 and to the "continued market acceptance of the ET4000." (Ex. 87 of Pls.' Mem.). Lastly, Plaintiffs cite TLI's Form 10–Q for the quarter ending March 31, 1993. The information contained in this form repeated that found in the April 26, 1993 press release and added that the increase in earnings for the completed first quarter was due to initial shipments of the W32 and "continued strong demand for the ET4000." (Ex. 114 of Pls.' Mem.).

Plaintiffs do not challenge the accuracy of any of these statements. Rather, they claim that the statements were misleading because Defendants should have foreseen that sales of the ET4000 would eventually drop and should have warned investors of this fact. Contrary to Plaintiffs' assertions, the securi-

ties laws do not require companies to provide investors with every piece of information that has a bearing on earnings or that a reasonable investor would like to know. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993), *cert. denied, Ross v. ZVI Trading Corp.*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471 (N.D.Cal.1992). Each document cited by Plaintiffs, which were in the context of reporting TLI's past revenues, were true. In addition, Defendants made no projections about sales of the ET4000 but merely reported historical facts. *See Greenberg v. Compuware Corp.*, 889 F.Supp. 1012 (E.D.Mich.1995) (holding factually accurate statements of past operating results not actionable under securities laws); *Zucker v. Quasha*, 891 F.Supp. 1010, 1015 (D.N.J.1995) (same). Moreover, Plaintiffs have failed to allege any damages stemming from Defendants' statements concerning the ET4000. Accordingly, this Court finds that the statements regarding the ET4000 are not false or misleading and summary judgment will be granted in favor of Defendants with respect to this claim.

### B. Defendants' Statements Concerning the W32

As discussed above, in order to establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must prove, *inter alia,* that they sustained injury. Plaintiffs concede that they have not alleged any injury to the class prior to February 1, 1993 arising out of their W32 claims. Specifically, Plaintiffs are not seeking damages for any purchases of TLI stock during the period from October 29, 1992 through January 31, 1993. Thus, summary judgment will be granted in favor of Defendants on all claims prior to February 1, 1993. This leaves Plaintiffs with two remaining claims relating to the W32. The first such claim involves the statements which Defendants made in February 1993 regarding the commencement of "volume shipments." The second claim deals with Gibbons' statement to Reuters on March 9, 1993. These claims will be addressed in turn.

### 1. Defendants' February 1, 1993 Press Release

By the beginning of February 1993 TLI was late to the market with the W32 and was losing design wins as a result. In order to prevent the impression that TLI was falling behind its competitors, Plaintiffs argue that Defendants misrepresented the status of the W32 in a press release dated February 1, 1993. In this release, TLI announced that it had commenced "volume shipments" of the W32. Plaintiffs characterize this statement as a blatant misrepresentation for two reasons. First, the statement was misleading because it contained a material misstatement of fact. Second, the statement omitted to point out that TLI's delay in getting the W32 to market had cost the company significant design wins which would ultimately have a negative impact on its earnings.

### a. Material Misstatements of Fact

In February 1993, TLI had shipped approximately 27,767 W32s and a total of 301,750 units were shipped in March 1993.[6] (Ex. 32 of Defs.' Mem.). Plaintiffs do not dispute these numbers but argue instead that at the time the statement was made TLI was shipping "risk" units, not "production" units and that the shipment of "production" units did not begin until March 1993. Production units are distinguished from risk units in that production units are ordered and produced after the prototypes for the chips have undergone testing. Units ordered before the chips have undergone such testing are referred to as "risk" units. (Karsch Decl. at ¶ 3, Ex. 78 of Defs.' Mem.). If no changes are made to the design of the prototypes, the risk units are identical to the production units. *Id.*

6. In January 1993, TLI had orders for approximately 450,136 W32 units and shipped 2,720. In February, the number of orders was 570,752 and the amount shipped rose to 27,767. In March, TLI had 520,165 in orders and shipped 301,750 units. (Plaintiffs' Compilation of TLI's Open Order Reports, Ex. 49 to Pls.' Mem.).

7. By Order dated January 12, 1996, this Court denied Defendants' Motion to Disqualify Peddie as Plaintiffs' Expert.

Plaintiffs have submitted the affidavit of their proposed expert Jon Peddie ("Peddie").[7] Mr. Peddie stated that, in contrast to the term "volume shipments," the use of the term "risk shipments" conveys the impression that:

the manufacturer's product may still require adjustments to the design process and may not be in a position to permit the company to begin to earn significant money from the product (which generally has unfavorable profit margins in comparison to "volume" production), and that the company may be shipping chips in this "risk" form in an attempt to retain design wins.

(Peddie Decl. at ¶ 5, Ex. 6 of Pls.' Mem.). Plaintiffs do not dispute that at the end of December 1992 TLI had approved the W32 prototypes with no changes in design. (Karsch Decl. at ¶ 7). In addition, although customers may order risk units from TLI at a reduced price, the W32 units shipped in January and February of 1993 were shipped to fill production orders and sold at full price with full warranties. *Id.* Therefore, Plaintiffs' attempt to distinguish between "risk" units and "production" units fails to create a genuine issue of material fact. The statement made by TLI on February 1, 1993 conveyed to the market that they were commencing shipments of the W32 in volume. This Court finds that such statement was accurate and is not actionable under the securities laws.

### b. Material Omissions of Fact

Plaintiffs also argue that Defendants' statement regarding the commencement of "volume shipments" was misleading because it failed to mention that TLI's delay in getting the W32 to the market could cost TLI significant design wins, thereby reducing the company's earnings.[8] Defendants respond

8. Plaintiffs contend that Defendants omitted to state that TLI was losing its market share to its competitors. This argument will be rejected because TLI had no obligation to disclose this fact. "[I]t is precisely and uniquely the function of the prudent investor, not the issuer of securities, to make such comparisons among investments." *In re Donald J. Trump Sec. Litig.,* 7 F.3d 357, 375–76 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

by arguing that the assertion that TLI was late to the market is not a material fact under the securities laws because the public was already aware of such fact.

In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court defined the standard of materiality within the concept of proxy solicitations under Rule 14a–9 of the Exchange Act.[9] The Court stated that an omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important. *Id.* at 449, 96 S.Ct. at 2132. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Moreover, there can be no liability under the securities laws because of an alleged failure to disclose information that is already available to the public. This is because such information is already part of the "total mix." *In re Kulicke & Soffa Industries, Inc. Sec. Litig.*, 697 F.Supp. 183, 186 (E.D.Pa.1988); *In re Goodyear Tire & Rubber Company Sec. Litig.*, 1993 WL 130381 1993 U.S. Dist. LEXIS 5333, at *30 (E.D.Pa. April 21, 1993).

Defendants have produced various documents which indicate that TLI's delay getting the W32 to market was already known to the public, even before the Class Period. Initially, TLI expected meaningful sales contributions from the W32 to begin in the fourth quarter of 1992 and announced such in a press release dated April 27, 1992. On August 28, 1992, Wheat First Securities reported that TLI was approximately a quarter behind its original schedule on the W32. (Ex. 21 of Defs.' Mem.). Furthermore, on September 10, 1992, the *Wall Street Journal* reported that TLI's W32 was three months behind schedule. (Ex. 14 of Defs.' Mem.). On October 30, 1992, Pacific Growth Securities reported that regular production shipments of the W32 would begin in early 1993 rather than in the fourth quarter of 1992 because of a process change required at Toshiba, TLI's foundry. (Ex. 22 of Defs.' Mem.). Again, on November 18, 1992, Pacific Growth Securities announced that TLI would have had more design wins had it not experienced last minute problems with its foundry. (Ex. 23 of Defs.' Mem.).

Thus, the fact that TLI was late to the market was available to the investing public even prior to Defendants' statements in February 1993. Since this information had already entered the market, the facts allegedly omitted by Defendants would already be reflected in the stock's price. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir.1989). I find that Plaintiffs have failed to demonstrate that the claimed omissions involved material facts. Therefore, summary judgment will be granted in favor of Defendants on Plaintiffs' claim that the February 1, 1993 press release contained omissions of material fact.[10]

### 2. March 9, 1993 Reuters Report

Defendant Gibbons was interviewed by Reuters news service on March 9, 1993 and was quoted as saying the he expected TLI to ship 1.2 to 1.7 million W32 units in the second quarter of 1993. As it turned out, Defendants ended up shipping approximately 844,056 W32 units in the second quarter.[11] Plaintiffs contend that even if TLI's best internal estimates for the second quarter were realized, the range given by Gibbons was unattainable. Defendants respond that the Reuters report was not an accurate reflection of the interview that took place. Specifically, Gibbons maintains that he told

**9.** This standard was expressly adopted for actions brought under 10(b) and Rule 10b–5 in *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988).

**10.** Although the issue of materiality is usually a mixed question of law and fact which the trier of fact ordinarily decides, *see TSC Industries*, 426 U.S. at 450, 96 S.Ct. at 2132–33; *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n. 11 (3d Cir.1992), "if the alleged ... omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are [not actionable] as a matter of law." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir.1989).

**11.** The number of W32s shipped in April, May and June was 223,678, 228,842 and 391,536 respectively.

the reporter that he expected that "demand" for the W32 would be between 1.2 to 1.7 million units. Nevertheless, Defendants argue that even if Gibbons made the statement attributed to him, he had a reasonable basis for doing so.

### a. "Fraud by Hindsight"

In essence, Plaintiffs claim that because Gibbons' forward looking statement to Reuters report did not materialize, it must have been fraudulent when made. However, a claim under 10(b) and Rule 10b–5 is not stated solely because a projection later proves to be inaccurate. *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). This "fraud by hindsight" concept was discussed in the case of *In re Donald J. Trump Sec. Litig.,* 793 F.Supp. 543 (D.N.J. 1992), *aff'd,* 7 F.3d 357 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994):

> We are wary, too, of the dangers raised by claims of "fraud by hindsight." Monday morning quarterbacking cannot present actionable securities fraud claims.... At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiffs contend that the difference must be attributable to fraud.... Because only a fraction of financial determinations reflect fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Trump,* 793 F.Supp. at 556–57, *quoting, DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

■ In order to establish liability for a forward looking statement such as the one made by Gibbons, a plaintiff must prove that the statement was untrue when made and made with scienter. *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (citations omitted). A forward looking statement is untrue if made without a reasonable basis—that is, without a sound factual or historical basis. *Id.* Plaintiffs assert that Gibbons had absolutely no basis to make his statement because at the time the statement was made TLI had both inadequate supply and demand to ship in the upper realm of the 1.2 to 1.7 million range stated by Gibbons.

### b. Defendants' Supply of W32 Units

■ As of March 9, 1993, TLI had ordered approximately 1.2 million W32s from Toshiba for delivery in the second quarter of 1993. (Ex. 24 of Defs.' Mem.). TLI also ordered an additional 325,000 units for delivery during the second quarter of 1993 for a total of 1,525,000 units. Plaintiffs cite a letter dated February 1, 1993 from Toshiba proposing a support plan by which Toshiba would provide capacity for up to 1.45 million chips in the second quarter and argue that this amount is "far less than the 1.7 million units of the upper end of Gibbons' projections." *See* Pls.' Mem. at 52, n. 40. Defendants correctly point out that the 1.45 million figure is also far above the lower end of Gibbons' range. Defendant Gibbons does not dispute that at the time he was interviewed by the Reuter's reporter on March 9, 1993, he did not expect Toshiba to be able to supply TLI in the upper end of the range. However, Reuters printed a range and the undisputed facts show that Toshiba had the capacity to supply TLI with enough W32s to be well within such a range.

### c. Customer Demand for W32 Units

■ Gibbons indicates that his statement to Reuters was based on discussions with TLI's customers and the TLI sales department in addition to his review of sales forecasts and actual orders. (Gibbons Dep. at 109, Ex. 55 of Defs.' Mem.). Plaintiffs maintain that TLI's "own internal documents reveal that [TLI] had nowhere near orders for 1.2 million units at the time of Gibbons' interview." *See* Pls.' Mem. at 71. In support of this proposition, Plaintiffs rely on TLI Open Order Reports dated February 26, 1993 and March 31, 1993 as well as internal forecast produced on March 15, 1993.

The Open Order Report dated February 26, 1993 contained only actual orders for the W32 prior to that date. This report did not

account for the fact that TLI expected to receive more orders for the W32 after that date. Furthermore, the prospect of additional orders was strong in light of the fact that approximately 50% of TLI's sales in a quarter traditionally occurred in the last month of the quarter.[12] *See Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1453 (D.Mass. 1989) (holding plaintiff's argument that modest sales in first quarter made it reckless for defendants to project 30% growth in same quarter not supported by record since evidence showed a majority of defendant's sales occurred at end of quarter). As for the March 31, 1993 Open Orders report and the March 15, 1993 forecast, both were prepared after Gibbons' interview with Reuters. Furthermore, the March 15, 1993 forecast was based on internal discussions, not with TLI's customers.

In short, the evidence submitted by Plaintiffs is insufficient to show that Gibbons lacked a reasonable basis at the time of his statement to Reuters and Defendants could not foresee that its customers would experience delays in their own manufacturing facilities. "An inability to foresee the future does not constitute fraud." *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir. 1993). Furthermore, "[o]n its face, the word 'expects' limits [a] statement's potential to mislead." *Pache v. Wallace,* No. 93–5164, 1995 WL 118457 at *3 (E.D.Pa. March 20, 1995), *aff'd,* 72 F.3d 123 (3d Cir.1995). Accordingly, summary judgment will be granted in favor of Defendants on this claim.[13]

## IV. CONCLUSION

For the reasons expressed above, I am granting Defendants' Motion for Summary Judgment and will, therefore, enter the following Order:

---

12. For example, sales in the fourth quarter of 1992 consisted of the following number of units: October, 204,008; November, 351,970; and December, 625,076. Sales in the first quarter of 1993 consisted of: January, 301,006; February, 348,815; and March, 611,898. Similarly, sales in the second quarter of 1993 consisted of: April, 257,137; May, 270,522; and June, 544,578. (Karsch Decl. at ¶ 8, Ex. 78 to Defs.' Mem.).

*ORDER*

AND NOW, this 19th day of March, 1996, upon consideration of Defendants' Motion for Summary Judgment, and the response thereto, it is hereby ORDERED that said motion is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs.

---

13. Defendants also maintain that the March 9, 1993 Reuters article consisted of hearsay within hearsay and is, therefore, inadmissible. In light of this Court's decision that Defendant Gibbons had a reasonable basis for his remarks, this issue need not be addressed.