**In re DONALD J. TRUMP CASINO SECURITIES LITIGATION— Taj Mahal Litigation.**

MDL 864 (JFG).
Civ. A. No. 90–0919.

United States District Court,
D. New Jersey.

June 2, 1992.

Richard D. Greenfield, Mark C. Rivkin, Greenfield & Chimicles, Haverford, Pa.,

Stuart Wechsler, Joel C. Feffer, Wechsler Skirnick Harwood Halebian & Feffer, New York City, for plaintiffs.

Carl D. Poplar, Cherry Hill, N.J., Liaison Atty. for plaintiffs.

John J. Barry, Clapp & Eisenberg, P.C., Newark, N.J., Richard L. Posen, Wilkie Farr & Gallagher, New York City, for the Trump Defendants.

Stuart J. Baskin, Shearman & Sterling, New York City, for Merrill, Lynch, Pierce, Fenner & Smith, Inc., defendant.

## OPINION

GERRY, Chief Judge.

The parties are presently before the court upon motion of defendants Donald J. Trump, Robert S. Trump, Harvey S. Freeman, The Trump Organization Inc., Taj Mahal Funding Inc., Trump Taj Mahal Inc., and Trump Taj Mahal Associates Limited (collectively "the Trump defendants") and defendant Merrill, Lynch, Pierce, Fenner and Smith ("Merrill Lynch") for dismissal with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons expressed herein, defendants' motion is granted.

## BACKGROUND

The Taj Mahal ("the Taj") is a hotel/casino located on the boardwalk in Atlantic City, New Jersey. The project was initiated by Resorts International, Inc. ("Resorts") but was later sold to the Trump defendants. In 1988, as the primary source of funding for the Taj, the Trump defendants offered and Merrill Lynch underwrote $674 million in 14% first mortgage investment bonds ("the bonds"). The bonds were issued pursuant to a prospectus dated November 9, 1988 ("the prospectus").

After learning that the Taj intended to file Chapter 11 bankruptcy and establish a reorganization plan, various bondholders filed separate complaints in the Southern District of New York, the Eastern District of New York, and the District of New Jersey, alleging essentially similar claims that the prospectus included misrepresenta-

tions and omissions which violated federal securities fraud laws. The complaints were consolidated in multi-district litigation in this court. Plaintiffs await class certification.

In May, 1991, the parties reached a tentative settlement agreement, memorialized in a "Memorandum of Understanding" ("MOU"). The MOU provided for plaintiffs to conduct "confirmatory discovery" to determine whether they believed the settlement to be a fair disposition of the case. In October 1991, the plaintiffs returned from confirmatory discovery seeking to cancel the settlement deal. Defendants moved before this court for an order allowing them to solicit approval by the plaintiff class of the proposed settlement, over the objections of all plaintiffs' counsel. We denied that motion in a memorandum opinion and order dated November 15, 1991. This motion to dismiss, filed jointly by the Trump defendants and Merrill Lynch, followed.

### THE COMPLAINT

Count one of plaintiffs' complaint alleges that the prospectus "contained untrue statements of material facts and omitted to state material facts required to be stated therein which were necessary to make the statements therein not misleading," in violation of sections 11, 12(a) and 15 of the Securities Act of 1933. Count two alleges fraud in the prospectus in violation of sections 10(b) and 20(b) of the Exchange Act of 1934, and Rule 10b–5 promulgated thereunder. Count two also alleges, as part of the securities fraud claim, that the prospectus contained false and misleading information.

Count three, a breach of fiduciary duty claim, is lodged only against defendant Donald Trump. Count four is a common law false advertising claim. Counts three and four present solely state law claims, which depend for their survival on this court retaining jurisdiction over the federal securities claims.

### THE PROSPECTUS [1]

The prospectus is a lengthy, detailed document. On the first page this notice appears in bold print: "See 'Special Considerations' for a discussion of certain factors to be considered by potential investors." There follows a section entitled "PROSPECTUS SUMMARY" which notes *inter alia* that "[u]pon completion, the Taj Mahal will be the largest casino/hotel facility in Atlantic City." Prospectus, at 3.[2] Included in the prospectus summary is a synopsis of the Special Considerations section:

#### Special Considerations

There are special considerations associated with an investment in the Bonds. These special considerations include, among others, the ability of the Partnership to service its debt; the validity of the security of the Bonds; the possible effect of applicable fraudulent conveyance statutes; the risks regarding completing and opening the Taj Mahal; the terms of the Trump Completion Guaranty; potential conflicts of interest; competition; limitation of liability; management of the Taj Mahal; certain regulatory matters, including matters affecting ownership of the Bonds; absence of a public market for the Bonds; the maintenance of insurance; and the appraisals of the Taj Mahal.

---

**1.** Although challenging the prospectus directly, plaintiffs failed to attach a copy of it to their complaint. Indeed, plaintiffs did not even reference page numbers of the portions of the prospectus quoted or challenged in the complaint. Defendants have submitted a complete copy of the prospectus on this dismissal motion, and argue that we should consider it even though plaintiffs failed to attach it to their pleading, despite the fact that 12(b)(6) motions to dismiss are to be limited to matters raised in the pleadings. We agree, and "decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference." *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991). *See also Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991). Accordingly, we will consider the prospectus together with the pleadings on this motion.

**2.** This statement is repeated at page 31 of the prospectus.

Prospectus at 4. The "Special Considerations" section opens with the following notice, in italicized print:

> Before making a decision to purchase any of the Bonds, prospective purchasers should consider carefully **the following factors,** among others set forth in this Prospectus, which **could materially adversely affect (i)** the operations of the Partnership and **its ability to make necessary payments to the Company to meet the debt service requirements of the Bonds** and (ii) the security for the Bonds.

Prospectus at 8 (emphasis added). Each special consideration listed in the "Special Considerations" synopsis constitutes a subject matter heading under the "Special Considerations" section, and is explained in considerable detail there.

Following the "Special Considerations" section is the meat and potatoes of the prospectus, "Management's Discussion and Analysis of Financial Conditions and Results of Operations of the Partnership and the Company" ("Management's Discussion"). The entire prospectus is replete with cross-references directing potential investors to related portions of the prospectus.

## DISCUSSION

### I. Standards on Motion to Dismiss

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). We must accordingly consider the factual allegations of the complaint as true, construe them liberally, and draw all reasonable inferences in plaintiff's favor. *See Unger v. National Residents Matching Program,* 928 F.2d 1392 (3d Cir.1991); *Glenside West Corp. v. Exxon Co., U.S.A., Div. of Exxon Corp.,* 761 F.Supp. 1100 (D.N.J.1991); *Gut-*

*man v. Howard Sav. Bank,* 748 F.Supp. 254 (D.N.J.1990); *Leaty v. U.S.,* 748 F.Supp. 268 (D.N.J.1990). If, applying these standards, plaintiffs cannot state an actionable claim, the complaint must be dismissed.

We take this occasion to comment on the extent to which this court may consider matters outside the pleadings on a 12(b)(6) motion to dismiss. In opposing defendants' motion, plaintiffs have submitted considerable materials, including affidavits, deposition transcript excerpts, and an appraisal report, accompanied by an identifying affidavit. Plaintiffs urge that we may consider these materials, which are clearly matters outside the pleadings, without converting the 12(b) motion into a Rule 56 motion for summary judgment. We disagree.

Plaintiffs rely on *Swin Resource Systems v. Lycoming County,* 883 F.2d 245, 247 (3d Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990), for the proposition that extraneous materials that "fall within the ambit of the complaint" may be considered on a motion to dismiss. In fact, in *Swin* the extraneous material considered—a deposition—was attached to the complaint at the time of filing. Plaintiffs here attached no materials, not even the prospectus, to their complaint. The depositions and other materials they now urge us to consider as falling within the ambit of the complaint were never submitted to this court until plaintiffs opposed the current motion. We do not think that these materials fall within the ambit of the complaint, as courts in this circuit have used that phrase.[3] The materials which plaintiffs urge us to consider are the stuff of summary judgment motions, not motions to dismiss under 12(b)(6).

### II. Choice of Law

A threshold question is which circuit's law should be applied to judge the actionability of the prospectus. Although the case has been consolidated in this district, within the Third Circuit, the underlying cases

---

3. For example, citing *Swin,* the court in *In re Bell Atlantic Corporation Securities Litigation,* 1991 WL 234236, 1991 U.S.Dist. LEXIS 15874

(Oct. 10, 1991), considered "documents attached to the complaint, in addition to memoranda and briefs" in deciding a motion to dismiss.

come not only from this district but also from the Southern District of New York and the Eastern District of New York, both within the Second Circuit.[4] The question to be decided is whether the law of the Third or Second Circuit controls our decision.

■ In a case consolidated under 28 U.S.C. § 1407, the law of the transferor forum must be given "close consideration," but the law of the transferee forum ultimately controls. *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1176 (D.C.Cir.1987).

> The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.

*Id.* Accordingly, the law of the Second Circuit must be given close consideration here, but does not have *stare decisis* effect. As defendants point out, we are faced with a relatively blank slate on certain crucial issues in the Third Circuit, while we are well-instructed on those issues by the Second Circuit and other circuits as well.

**4.** We note that Merrill Lynch is a defendant only in cases filed within the Second Circuit.

**5.** Section 11(a), 15 U.S.C. § 77k(a) provides in pertinent part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security [may bring suit against]
> (1) every person who signed the registration statement;
> (2) every person who was a director of ... or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; ...
> (5) every underwriter with respect to such security.

> Section 10(b), 15 U.S.C. § 78j(b) provides in pertinent part:
> It shall be unlawful for any person, directly or indirectly ...
> (b) to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in

## III. *The Federal Securities Fraud Claims*

The complaint essentially sets forth claims under section 11(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77k(a); and section 10(b) the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder.[5] The crux of our analysis is whether the complaint adequately alleges that the prospectus contained material false and misleading statements or omissions.

The complaint alleges misrepresentations with respect to three general aspects of the prospectus: the defendants' ability to service the debt on the bonds; the competition which the Taj Mahal would face; and the appraisals relied upon by defendants in valuing the Taj. All these aspects deal with future projections or forecasts. The complaint further alleges misrepresentations about the state of Donald Trump's "financial empire," contained both in the prospectus and in various media sources.

In support of dismissal, defendants argue that the prospectus so "bespeaks caution" that the statements and omissions specified in the complaint are not actionable. Plaintiffs respond that no amount of cautionary language can render a false or

> contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

> Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, promulgated pursuant to section 10(b), provides in pertinent part:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality ...
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

misleading omission or a fraudulent misrepresentation not actionable; that the complaint adequately alleges such omissions and misrepresentations; and that the complaint therefore states claims of securities fraud sufficient to withstand a motion to dismiss.[6]

IV. *The "Bespeaks Caution" Approach to Federal Securities Fraud Claims*

■ We examine first the "bespeaks caution" doctrine relied upon by defendants. The essence of the doctrine is that where an offering statement, such as a prospectus, accompanies statements of its future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud. Within the past thirteen months, five circuit courts have adopted this approach to evaluating the actionability of a federal securities fraud claim based on future projections contained in a prospectus or other offering statement. *See Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 (1st Cir.1991); *I. Meyer Pincus & Associates v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 763 (2d Cir.1991); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir.1991); *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 949 F.2d 243, 245–46 (8th Cir.1991); *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 516 (9th Cir.1991). Because the trend in the law heavily favors this approach, a comprehensive examination of it is warranted.

A. Origins of the "Bespeaks Caution" Approach

The "bespeaks caution" formula was first devised in *Polin v. Conductron Corp.*, 552 F.2d 797 (8th Cir.1977), a shareholder suit alleging securities fraud based on allegedly false and misleading statements in proxy statements, annual reports, and other documents. In affirming a judg-

ment on the merits for defendants after trial, the *Polin* court held that the terminology employed in an annual report, specifically that results were " 'expected' to show improvement" and that there was "a 'possibility' of a break-even soon," were terms which "bespeak caution in outlook and fall far short of the assurances required for a finding of falsity and fraud." *Id.*, 552 F.2d at 806, n. 28.

Subsequently, the Second Circuit decided *Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986), a case generally regarded as seminal. The court in *Luce* found that while some of plaintiffs' allegations were sufficient to state a claim for relief under section 10(b), including allegations that defendants made promises which they knew at the time to be false, other allegations of intentional misrepresentation as to the potential success of the defendant partnership could not survive a motion to dismiss. The challenged statements at issue were specifically addressed by cautionary language:

the Offering Memorandum made it quite clear that its projections of *potential* cash and tax benefits were "necessarily speculative in nature" and that "[n]o assurance [could] be given that these projections [would] be realized." Indeed, *the Offering Memorandum warned prospective investors that "[a]ctual results may vary from the predictions and these variations may be material." We are not inclined to impose liability on the basis of statements that "bespeak caution."*

*Id.* at 56 (emphasis added). The *Luce* court relied on *Polin* for this proposition.

District courts in the Second Circuit have followed the *Luce* "bespeaks caution" approach consistently. *See e.g., Haggerty v. Comstock Gold Co., L.P.*, 765 F.Supp. 111, 114 (S.D.N.Y.1991); *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 162 (S.D.N.Y.1990) (with respect to

---

**6.** Defendants have argued various alternative grounds for dismissal, specifically that the complaint fails to satisfy the fraud pleading requirements of Fed.R.Civ.P. 9(b); that it fails to properly plead the statute of limitations; and that it fails to adequately plead reliance on the alleged

misrepresentations, an essential element to recovery under sections 11 and 10b. Because we dispose of the motion on the "bespeaks caution" and other related bases, we do not reach these alternative arguments.

future projections, no liability under section 10b for statements that "bespeak caution"); *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1201–02 (S.D.N.Y.1990); *Friedman v. Arizona World Nurseries Limited Partnership*, 730 F.Supp. 521, 541 (S.D.N.Y.1990) (warnings and disclaimers limit degree to which investors may reasonably rely on offering document as forecast of future performance), *aff'd without opinion*, 927 F.2d 594 (2d Cir.1991); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 227 (S.D.N.Y. 1989); *Stevens v. Equidyne Extractive Industries 1980, Petro/Coal Program 1*, 694 F.Supp. 1057, 1063 (S.D.N.Y.1988) (no liability attaches to offering memorandum purporting to be speculative); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 171 (S.D.N.Y.1988) (no reasonable reliance where offering document informed that estimates were speculative).

*Luce v. Edelstein* also has been cited with approval by this court. In *In re National Smelting of New Jersey, Inc. Bondholders' Litigation*, 722 F.Supp. 152, 171 (D.N.J.1989) (Gerry, C.J.), this court relied on *Luce* in granting summary judgment in favor of a third-party defendant accounting firm in a false and misleading prospectus case:

> In a similar situation, the Second Circuit Court of Appeals in *Luce v. Edelstein* refused to find 10(b) liability to the authors of an offering memorandum, which had "warned prospective investors that '[a]ctual results may vary from the predictions and these variations may be material.'" The court, speaking through Judge Winter, stated: "We are not in-

clined to impose liability on the basis of statements that clearly bespeak caution." *Id.* at 171 (citations omitted). The language at issue in that portion of *National Smelting* contained the following warning: "It is usually the case that one or more of the assumptions in a forecast do not materialize because events and circumstances do not occur as expected. Therefore, the actual results during the forecast period will differ from the forecasted results; the differences may be material." *Id.*[7]

**B. Recent Developments in the "Bespeaks Caution" Approach**

Most recently, the First, Second, Sixth, Eighth and Ninth Circuit Courts of Appeals have explicitly adopted the "bespeaks caution" approach to securities fraud claims.[8] In *Romani v. Shearson Lehman and Hutton*, the plaintiffs had alleged that defendants fraudulently induced them into investing in a horse-breeding farm "through misrepresentations and omissions in the offering materials that falsely inflated the partnership's financial potential." *Romani*, 929 F.2d at 876. Plaintiffs claimed that several material adverse facts were deliberately withheld by defendants from the prospectus. The First Circuit, however, placed dispositive weight on this statement in the prospectus: "[t]here can be no assurance that the investment objectives of the Partnership will be obtained." *Id.* at 879. This directly led the court to hold that "although the offering materials were optimistic about the prospects for [the business enterprise], the documents unquestionably warned potential investors in a meaningful way that economic conditions in the horse-breeding industry were uncertain. Documents such as this, which 'clearly "be-

---

**7.** *National Smelting* is the only case in this circuit which has applied *Luce* and the "bespeaks caution" doctrine. Only one other case in this circuit has referred to the "bespeaks caution" approach of *Luce v. Edelstein*. *See Fitch v. Radnor Industries, Ltd.*, 1990 WL 150110 1990 U.S. Dist LEXIS 13023 (E.D.Pa. October 2, 1990). In *Fitch*, the court referred to *Luce* but did not reach application of it because the court found dismissal warranted on Rule 9(b) grounds of inadequately plead fraud.

**8.** The Third Circuit has yet to consider the issue. Plaintiffs have argued that a Third Circuit case,

*Herskowitz v. Nutri/System*, 857 F.2d 179, 185 (3d Cir.1988), "rejects" the "bespeak caution" argument relied upon by defendants. However, *Herskowitz* never addressed the "bespeaks caution" approach and therefore could not have and did not reject it. Moreover, in *Herskowitz* the truth or falsity of an expert opinion was at issue, rather than management's forecasts and predictions. The analysis for each is necessarily different, because the latter deals merely with speculation as to future events and results, conditioned on factors of uncertain resolution, rather than existing factual information.

speak caution," ' are not the stuff of which securities fraud claims are made...." *Id.*

Similarly, in *I. Meyer Pincus & Associates v. Oppenheimer & Co.*, the Second Circuit "declined to impose liability" on the basis of "statements contained within the prospectus [which] clearly 'bespeak caution,' rather than encouraging optimism." The court accordingly ruled that the language of the prospectus, "when read in context, is not materially misleading." *I. Meyer Pincus*, 936 F.2d at 763. The court also considered important the fact that "the first sentence of the Prospectus Summary, which states that the summary 'is qualified in its entirety by reference to the more detailed information included elsewhere in the prospectus,' *unambiguously* communicates the importance of reading *all* relevant material contained within the prospectus." *Id.* (Emphasis added.)

In *Sinay v. Lamson & Sessions Co.*, the Sixth Circuit affirmed the dismissal of an action alleging securities fraud under a fraud-on-the-market theory. *Citing Polin*, the *Sinay* court held specifically that "[e]conomic projections are not actionable if they bespeak caution." *Sinay*, 948 F.2d at 1040. The court continued,

> [i]n determining whether the statements are actionable, the court must scrutinize the nature of the statement to determine whether the statement was false when made. While analyzing the nature of the statement, the court must emphasize whether the "prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis."

*Id.* (Citations omitted.) Applying this standard, the court held that the "questioned statements herein were phrased with sufficient cautionary language." *Id.* Indeed, each challenged statement was accompanied or addressed by "cautionary language." Additionally, the *Sinay* court cited to the proposition that "fraud by hindsight," the attempt to impose liability on management for unrealized economic predictions, is not actionable. *Id., citing Schwartz v. Novo Industri, A/S*, 658 F.Supp. 795, 799 (S.D.N.Y.1987).

The Eighth Circuit reinforced its position on the "bespeaks caution" doctrine when it affirmed summary judgment for defendants in *Moorhead v. Merrill Lynch*. Plaintiffs in *Moorhead* had brought a securities fraud claim for alleged misrepresentations in a bond offering statement. They argued that defendant had "made misrepresentations, omitted material facts and made economic predictions with reckless disregard for their validity," urging the appeals court to reverse the finding that any misrepresentations or omissions were disclosed by specific cautionary language in the challenged document. *Moorhead*, 949 F.2d at 245. However, in affirming the district court's holding, the appeals court agreed that "plaintiffs could not base a federal securities fraud claim on any misrepresentation or omission in the feasibility study which was addressed by the repeated, specific warnings of significant risk factors and the disclosures of underlying factual assumptions also contained therein." *Id.* at 245–46. The cautionary language considered by the *Moorhead* court included the following:

> We believe that *the underlying assumptions provide a reasonable basis for management's forecast. However,* some assumptions inevitably will not materialize and unanticipated events and circumstances may occur; therefore, *the actual results achieved during the forecast periods will vary from the forecast and the variations may be material.* The accompanying financial forecast indicates that sufficient funds will be generated to meet [expenses], including the debt service requirements.... However, the achievement of any financial forecast is dependent upon future events, the occurrence of which cannot be assured.

*Id.*, 949 F.2d at 246 n. 2 (emphasis added). The document also contained several other examples of "no representations or assurances can be made" language. *Id.*

Finally, the Ninth Circuit joined in adopting the "bespeaks caution" approach. The court in *In re Convergent Technologies* highlighted the importance of viewing the

challenged statements in context, noting that "to prevail, the plaintiffs must demonstrate that a particular statement, *when read in light of all the information then available to the market,* or a failure to disclose particular information, conveyed a false or misleading impression." *Convergent Technologies,* 948 F.2d at 512 (emphasis added). Plaintiffs in *Convergent Technologies* had argued that it was a violation of securities fraud laws for defendants to omit internal corporate projections from the offering statement. However, in affirming summary judgment, the court relied on *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980), which held that "[i]t is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public." *Convergent Technologies* at 516 (emphasis in original). Additionally, regarding cautionary language, the court found that the challenged prospectuses "provided more than generalized statements of risk." *Id.* These included statements that future success was dependent on several enumerated factors of uncertain result, warnings of "unanticipated problems" down the line, and notice that plaintiffs were investing in a new, untried venture. *Id.*

### C. Considerations in Adopting the "Bespeaks Caution" Approach

Plaintiffs respond to this body of securities fraud law by arguing that the only question properly before this court on a motion to dismiss is whether the complaint alleges false and misleading statements or omissions, or misrepresentations. They argue that they have adequately pled such claims, and that the cautionary language in the prospectus cannot insulate defendants from liability or preclude plaintiffs from stating a cognizable claim.

Plaintiffs are correct in stating that a "projection that is issued without a reasonable basis is an untrue statement and actionable under § 10(b) and Rule 10b–5 if made knowingly or recklessly." *In re Craftmatic Securities Litigation,* 890 F.2d

628, 645–46 (3d Cir.1989); *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Urbach v. Sayles,* 779 F.Supp. 351, 355 (D.N.J.1991) ("projections or estimates can ground a fraud claim under the securities laws"). The same is true for section 11 claims. The Supreme Court has recently confirmed that "statements of reasons, opinion or belief" regarding projections are actionable under the securities fraud provisions. *See Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991).

However, defendants maintain that a prospectus which "bespeaks caution" displaces a misrepresentation claim. They argue that the securities fraud laws are concerned with management's disclosure, not management's business judgment; and that so long as full disclosure is made, unrealized future projections cannot be actionable as securities fraud.

Thus, we must determine which comes first in our consideration of this case: the cautionary language of the prospectus, or the allegations of misrepresentations in the complaint. If any allegation of falsity or misrepresentation can survive a motion to dismiss, then language in a prospectus which "bespeaks caution" as to future forecasts is irrelevant. However, if adequate cautionary language in a prospectus is the equivalent of full disclosure pertaining to forecasts and predictions, relieving defendants of securities fraud liability, then plaintiffs' claims are not actionable. In essence, the "bespeaks caution" analysis would subsume or obviate the analysis regarding adequate allegations of falsity or misrepresentation.

We think that the latter view is precisely how the "bespeaks caution" doctrine should be applied. As the Eighth Circuit has held, "plaintiffs could not base a federal securities fraud claim on any misrepresentation or omission in the feasibility study which was addressed by the *repeated, specific warnings of significant risk factors and the disclosures of underlying factual assumptions also contained*

*therein.*" *Moorhead,* 949 F.2d at 245–46 (emphasis added). In considering whether a complaint states a claim under either section 10(b) or section 11, "we examine the prospectus together with the allegations contained on the face of the complaint." *I. Meyer Pincus,* 936 F.2d at 762. Thus, the allegations of the complaint are not read in isolation; they cannot be separated from the text of the prospectus, including whatever cautionary language appears in that text.

Moreover, "[i]n determining whether the statements are actionable, the court must scrutinize the nature of the statement to determine whether the statement was false when made. While analyzing the nature of the statement, the court must emphasize whether 'the prediction suggested reliability, *bespoke caution,* was made in good faith, *or* had a sound factual or historical basis.'" *Sinay* at 1040 (*quoting Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 204 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (emphasis added). Thus, whether an offering statement such as a prospectus "bespeaks caution" is directly relevant to whether it is actionable. Indeed, the court "must emphasize" whether a statement "bespoke caution," *id.,* indicating that such a factor is at the least a powerful consideration and may even be dispositive.

Thus, the "bespeaks caution" approach answers in a dispositive way a misrepresentation claim. The "bespeaks caution" analysis subsumes the misrepresentation analysis. No reasonable inference can be drawn in favor of a plaintiff that a document or statement which bespeaks caution as to future forecasts contains actionable misrepresentations.

This approach is also consistent with the current state of Third Circuit law in this area. Under *Craftmatic,* a statement issued without a reasonable basis is untrue "if made knowingly *or recklessly.*" *Craftmatic,* 890 F.2d at 646 (emphasis added). A statement accompanied by language which "bespeaks caution" cannot be said to have been made "recklessly." Thus, it is necessary first to consider the cautionary

language of a prospectus, and to consider the challenged statements in context, in determining whether a complaint alleges actionable omissions or misrepresentations.

Plaintiffs also urge us to refrain from following the guidance of *Luce* and other similar cases, relying for this argument on *Griffin v. McNiff,* 744 F.Supp. 1237, 1253–54 (S.D.N.Y.1990), and *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 619 (S.D.N.Y.1990). Plaintiffs maintain that these cases rejected the "bespeaks caution" approach. In fact, *Griffin* and *Landy* did not reject that approach. They merely distinguished the facts before them from those at issue in *Luce* and other cases which applied the "bespeaks caution" analysis to find a claim not actionable. The *Griffin* court even acknowledged that

> warnings and disclaimers may limit the extent to which an investor can rely on the offering documents as a forecast of future events. Dismissal of securities fraud claims may be appropriate where the offering documents specifically warn plaintiffs not to rely on the alleged misrepresentations made by defendants, thus making any subsequent reliance unjustified.

*Griffin,* 744 F.Supp. at 1253. Thus, plaintiffs' argument that these two cases preclude our application of the "bespeaks caution" doctrine must fail.

Plaintiffs also contend that, were this court to allow statements such as "no assurances can be given" to relieve defendants of liability, "the securities laws would cease to have any practical effect." They appeal to our sense of "fairness," contending that "[i]t is admirable to bespeak caution. It is required to bespeak the whole truth. Describing an investment as speculative is not a license to misrepresent material facts."

This is a misreading of the "bespeaks caution" approach, and indeed of the policies behind the securities fraud laws themselves. The "bespeaks caution" approach demands far more than merely describing an investment as speculative. It neither immunizes fraud nor nullifies the securities fraud protections of sections 11 and 10b.

These laws are intended to ensure that investors have all the information they need in order to make educated investment decisions. We think that the "bespeaks caution" doctrine is itself an endorsement of that fundamental concept of the securities laws, the touchstone of which is disclosure.

We do note the troubling possibility that the "bespeaks caution" doctrine will encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language. It is for this reason that the "bespeaks caution" doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus. A blanket warning that the within investment is "risky," for example, would be insufficient to ward against a federal securities fraud claim. Nor would our holding here apply to cautionary language regarding actual facts, such as past performance of an existing investment or the contents of appraisals or other expert reports referenced in the prospectus.

Having established the legal framework in which to analyze the prospectus at issue here, we now turn to apply that framework.

V. *Plaintiffs' First Claim—The Ability of Partnership to Service the Debt on the Bonds*

Plaintiffs' primary complaint is that defendants did not have a reasonable basis for believing that it could service the debt on the bonds, and that defendants made various omissions or misrepresentations with respect to their ability to do so. We therefore begin by perusing the portions of the prospectus which relate to this claim.

A. The Prospectus

The "Special Considerations" section discussed *supra* contains several cautionary sub-sections, the first of which is entitled "Ability of the Partnership to Service Debt." This sub-section includes the following cautionary language:

Upon consummation of the offering of the Bonds, the Partnership will have outstanding indebtedness in the aggregate principal amount of $675,000,000.... The casino business in Atlantic City, New Jersey has a seasonal nature of which summer is the peak season. The anticipated opening date of the Taj Mahal is on or about February 15, 1990. Since the third interest payment date on the Bonds occurs before the summer season, the Partnership will not have the benefit of receiving peak season cash flow prior to the third interest payment date, **which could adversely affect its ability to pay interest on the Bonds.**

The sole business of the Partnership will be to acquire, construct and operate the Taj Mahal and its ancillary facilities. **The Taj Mahal has not been completed and, accordingly, has** no operating history. The Partnership, therefore, has **no history of earnings and its operations will be subject to all of the risks inherent in the establishment of a new business enterprise. Accordingly, the ability of the Partnership to service its debt to the Company is completely dependent upon the success of that operation and such success will depend upon financial, business, competitive, regulatory and other factors affecting the Taj Mahal and the casino industry in general, as well as prevailing economic conditions.** See "Capitalization" and "Business of the Partnership."

**The Taj Mahal will be the largest casino/hotel complex in Atlantic City,** with approximately twice the room capacity and casino space of many of the existing casino/hotels in Atlantic City. Neither the Partnership nor any other casino/hotel operator has had experience operating a complex the size of the Taj Mahal in Atlantic City. Consequently, **no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service on the Note** and/or any future borrowings by the Partnership.

Prospectus at 8 (emphasis added).

The next sub-section in "Special Considerations," entitled "Security for the

Bonds," contains the following pertinent statements:

> If an Event of Default occurs prior to completion of the Taj Mahal, upon foreclosure and sale of the Collateral, there would not be sufficient proceeds to pay the principal of, and accrued interest on, the Bonds.... In addition, **if an Event of Default occurs with respect to the Bonds after completion of the Taj Mahal, there can be no assurance that the liquidation of the Collateral would produce proceeds in an amount which would be sufficient to pay the principal of, and accrued interest on, the Bonds.** See "Description of the Bonds—Security" and "—Non-recourse."

> In any foreclosure sale of the Taj Mahal, the purchaser would need to be licensed to operate the Taj Mahal under the New Jersey Casino Control Act and the regulations promulgated thereunder.... Because potential bidders must satisfy such requirements, **the number of potential bidders in a foreclosure sale would be less than in foreclosures of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal.** The ability to repossess and dispose of the Collateral upon acceleration of the Bonds is likely to be significantly impaired or delayed by applicable bankruptcy law if a bankruptcy case were to be commenced by or against the Partnership prior to the repossession or disposition of the Collateral by the Trustee or the Bondholders.

Prospectus at 9 (emphasis added).

Following the "Special Considerations" section is the "Management's Discussion" portion of the prospectus. It states in pertinent part that:

> After the completion and opening of the Taj Mahal, the Partnership will rely on cash generated from the Taj Mahal's operations to service its debt and provide for anticipated capital requirements. **The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal). No assurance can be given, however,**

**that actual operating results will meet the Partnership's expectations.** See "Special Considerations—Ability of the Partnership to Service Debt" and "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal—Consequences of Delay."

Prospectus at 28 (emphasis added). These excerpts represent the portions of the prospectus implicated by plaintiffs' challenge that defendants violated federal securities laws by failing to inform that the partnership could not service its debt. We must examine them in light of the law set forth *supra*, in order to determine whether plaintiffs have stated a claim upon which relief may be granted.

B. Application of the "Bespeaks Caution" Approach

■ The heart of plaintiffs' claim is that defendants possessed no reasonable basis for the statement in the prospectus that they believed the Taj could generate sufficient funds to cover all the debt service on the bonds. They base this claim on one sentence buried in the middle of the prospectus: "The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)." Plaintiffs have extracted one lone statement from this comprehensive document and attempted to persuade the court that standing alone and read out of context it is sufficient to state a federal securities fraud claim. We are not so persuaded.

The above-quoted language from the prospectus is a striking example of a document which truly "bespeaks caution." Indeed, this prospectus " 'virtually bristle[s] with warnings' as to the extremely risky nature of the investment described herein, as well as the highly speculative nature of the memoranda's projections as to future results." *Haggerty*, 765 F.Supp. at 115 (*quoting CL–Alexanders Laing*, 739 F.Supp. at 162).

In stating their "no reasonable basis" claim, plaintiffs have utterly disregarded the entire "Special Considerations" section of the prospectus, as well as the language

immediately following the challenged statement, which reads: "No assurance can be given, however, that actual operating results will meet the Partnership's expectations." Thus, plaintiffs have attempted to base their case on a statement which is in fact directly addressed by specific, cautionary language throughout the prospectus and immediately following the challenged statement.

Plaintiffs have failed to confront the fact that the context of an allegedly false and misleading statement is a crucial consideration. The actionability of an isolated statement in a challenged prospectus depends upon its framework. This is as true in a "bespeaks caution" case as in any other securities fraud case. Solitary statements alone cannot support a federal securities law claim when read out of context. *See, e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (in section 14a proxy statement case, materiality is determined by the "total mix" of information available to the investor); *I. Meyer Pincus,* 936 F.2d at 763; *Convergent Technologies,* 948 F.2d at 512. Here the context fairly screams caution. As a matter of law, we find that no reasonable investor could have been misled by the sole sentence, buried in the middle of the prospectus and preceded by pages of pertinent warnings, which plaintiffs claim was misleading. Ultimately, the text of the prospectus itself shields defendants from liability, for it is a carefully crafted, fully disclosing document.

In *Moorhead,* a case factually similar to this case, the district court rejected plaintiffs' federal securities fraud claim because the challenged document "contained a number of risk statements, detailed cautionary language and disclosures about the underlying economic assumptions, any of which could have affected [management's] ability to pay back the bonds." *Moorhead,* 949 F.2d at 245. We think that the case at bar is no different. Such inclusions speak di-

rectly to the reasonable basis of management's beliefs. Certainly management is not required to offer investments pursuant to a prospectus which disparages the very viability of that investment.

In fact, the prospectus does set forth the basis for management's "belief" in its ability to meet the debt service: the AGI Report, the appraisal of the future worth of the Taj. Plaintiffs allege that this appraisal itself was made without a "reasonable basis," and therefore management's reliance on it also has no reasonable basis. However, we find that this attenuated linkage cannot support a claim of securities fraud.

In attempting to distinguish *Romani, I. Meyer Pincus, Sinay, Moorhead* and *Convergent Technologies,* plaintiffs argue that while the alleged misrepresentations in those cases were directly contradicted by disclaimers, the same is not true in this case. Upon close inspection of the prospectus here, we cannot agree. If anything, this prospectus includes even more specifically tailored disclaimers directly addressing each challenged statement, than did the offering materials at issue in those five appellate decisions. This distinction must therefore be rejected.[9]

### C. Fraud by Hindsight

██ We are wary, too, of the dangers raised by claims of "fraud by hindsight." Monday morning quarterbacking cannot present actionable securities fraud claims. "The fact that a projection or estimate turned out to be incorrect, standing alone, does not even raise an inference that the statement was fraudulent when made." *Urbach v. Sayles,* 779 F.Supp. 351, 358 (D.N.J.1991). Indeed,

> [t]he story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that

**9.** Plaintiffs have impliedly argued that the facts of this case are more closely analogous to those in *Griffin* and *Landy,* which refused to apply *Luce,* than to those in the five recent appellate decisions. We disagree. The court in *Griffin*

and *Landy* refused to apply the cautionary language approach because the alleged misrepresentations at issue were not directly contradicted by any cautionary language. That is in no way similar to the case at bar.

the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial determinations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). In the case at bar, "defendants anticipated profits, not losses. It is true that defendants' roseate economic anticipations were doomed, but economic prognostication, though faulty, does not, without more, amount to fraud." *Polin*, 552 F.2d at 805. In short, fraud by hindsight is not an actionable claim. *See Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 799 (S.D.N.Y. 1987). ("[p]laintiff fails to offer a single objective fact to suggest that the prediction was other than an honestly held view.... the complaint is an example of alleging 'fraud by hindsight' and therefore not actionable under § 10b and Rule 10b–5").

Moreover, the prospectus gave fair warning that the success of the Taj and the partnership's ability to service the debt on the bonds depended entirely on numerous future conditions and occurrences, many of them out of defendants' control. Thus, the prohibition against fraud by hindsight claims and the "bespeaks caution" doctrine go hand in hand.

Plaintiffs have relied heavily, almost exclusively, on the allegation that there was no reasonable basis for the statement that "[t]he Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)." Considerations of cautionary language aside, a claim based solely on this statement simply is not actionable, for it alleges nothing more than fraud by hindsight. The Taj

was not ultimately able to generate funds sufficient to cover all of its debt service, and plaintiffs have cried "fraud" as a salve to their disappointment in a failed investment. However, failure of an investment is not intrinsically equatable with fraud in the offering of that investment. Such an equation is the very essence of fraud by hindsight.

The complaint itself dictates this interpretation of plaintiffs' claim. Plaintiffs' allegation of "no reasonable basis" is a naked assertion unsupported by any factual allegations in the complaint. Plaintiffs provide no foundation for their assertion that defendants either had no reasonable basis for its belief, or that defendants did not in fact hold that belief. While we are instructed to draw all reasonable inferences in favor of a complainant, we concur with the reasoning in *DiLeo*, that no reasonable inferences of fraud can be drawn from conclusory allegations devoid of factual basis.

Plaintiffs must show "objective evidence" that the challenged statement represents a dishonestly held belief, or a belief without reasonable basis. For example, in *Sinay*, "the plaintiffs did not offer any objective evidence that the statements were anything other than honestly held convictions based on the historical information which Lamson possessed." *Sinay*, 948 F.2d at 1040. That is virtually the same situation as is presented by the complaint now under review. In *Sinay* the district court dismissed the complaint pursuant to Rule 12(b)(6), and that dismissal was affirmed. Dismissal is appropriate on these grounds here as well.

D. Further Considerations Regarding the Ability to Service Debt on the Bonds Claim

In addition to the "no reasonable basis" allegation, the complaint lists five related "failures to disclose" which purport to allege factual omissions in the prospectus.[10]

10. For example, plaintiffs claim that the prospectus "failed to disclose that the Taj Mahal would require an unprecedented 'casino win' of approximately $1.3 million per day on a con- tinuing basis to meet its enormous debtload," failed to disclose that "a leading analyst of the casino industry" had warned Donald Trump that the Taj probably could not meet its debt

None can withstand the scrutiny of either the "bespeaks caution" inquiry, or the analysis employed in determining whether a complaint states a claim upon which relief may be granted. First, a federal securities fraud suit is not a game of "edit to win." It is neither the right nor the responsibility of investors, disgruntled or otherwise, to draft the prospectus themselves from the position of hindsight. It is management's responsibility to draft a prospectus which makes full disclosure. Bespeaking caution is an essential part of such disclosure, particularly regarding future projections. Plaintiffs cannot state a claim based on how, in retrospect, they would have preferred the cautionary language to be drafted. Nor are there any factual allegations in the complaint going to show that these omissions or failures to disclose were fraudulent.

Plaintiffs also allege that the prospectus "omitted to state, as required by Item 303 of Regulation S–K, that there existed 'known ... uncertainties' regarding whether operation of the Taj Mahal would generate sufficient funds to cover all of its debt service...." It is beyond this court's ken how plaintiffs could support such an allegation, considering the repeated warnings in the prospectus that there most definitely were "uncertainties" as to the ability of the Taj partnership to cover its debt service. For example, the prospectus clearly stated that there was no history of earnings at the Taj; that operations at the Taj would be "subject to all of the risks inherent in the establishment of a new business enterprise;" that the ability of the partnership to service its debt was "completely dependent" on many diverse factors, some not even within the partnership's control; and that "no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service on the Note and/or any future borrowings by the Partnership." Given this language, which we think unquestionably bespeaks caution, we fail to see how plaintiffs could succeed in convincing a reasonable jury

that the prospectus "omitted to state" uncertainties regarding the partnership's ability to generate funds sufficient to cover all of its debt service.

### E. The Taj Funding Claim

■ We note here a related allegation of plaintiffs, the claim that the prospectus failed to disclose that operation of the Taj involved an "excessive, unwarranted, and unprecedented debt component relative to total capitalization. Out of the $805 million total projected cost for acquisition, construction, initial financing and related costs, no more than $75 million (or only nine percent) represented capital contributions." Complaint, ¶ 36. This allegation also charges that the prospectus failed to disclose that "no other Atlantic City casino project was so thinly capitalized and, therefore, so vulnerable to downturns in the industry and economic downturns generally." We must therefore examine the language in the prospectus regarding the financing structure of the Taj.

In the "Special Considerations" sub-section entitled "The Financing," the prospectus states that "Approximately $805,000,000 will be required to (i) fund amounts needed to complete construction of and open the Taj Mahal ... (ii) repay all indebtedness incurred in financing the cost of and to pay certain assumed liabilities with respect to, the acquisition of the Property ..., and (iii) pay related expenses expected to be incurred...." Prospectus at 24. Beneath that appears the following chart:

#### Sources of Funds

(1) Gross proceeds of the Bonds ..... $675,000,000

(2) Capital contribution ................ 75,000,000

(3) Other sources..................... 55,000,000

Total ....................... $805,000,000

Footnote (2) states that the $75,000,000 capital contribution is to "be contributed to the Partnership by Donald J. Trump upon issuance of the Bonds."

In light of this disclosure, plaintiffs cannot state a securities fraud claim based

service, and "omitted to state" that such a large casino win was approximately five times the

average casino win for other Atlantic City casinos.

upon an allegation that the prospectus failed to disclose the debt component ratio. Such an allegation is patently false.

However, all reasonable inferences must be drawn from the complaint. It is perhaps reasonable to infer that plaintiffs claim, not that the prospectus failed to set forth the actual numbers, but that defendants failed to characterize those numbers as "excessive," "unprecedented," "unwarranted" and "thinly capitalized ... [relative to] other Atlantic City casino project[s]." However, given this inference, plaintiffs still cannot successfully state a securities fraud claim. A prospectus, while required to "bespeak caution," is not required to apply pejorative or derogatory descriptors to the investment it is selling. *See, e.g., Goldberg v. Meridor*, 567 F.2d 209, 218 n. 8 (2d Cir.1977) (Section 10b and Rule 10b–5 do not require characterizations of transactions "with pejorative nouns or adjectives"), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 228 (S.D.N.Y.1989) (claim that defendants failed to characterize fees and expenses of transaction as "excessive" not actionable; such a claim "admitt[ed] that the amount of fees and expenses was disclosed"); *Valente v. PepsiCo, Inc.*, 454 F.Supp. 1228, 1253 (D.Del.1978) (*citing Goldberg v. Meridor*). Accordingly, this allegation would not be actionable under federal securities laws simply for lacking descriptors such as "excessive" and "unwarranted." Nor is there any legal obligation for management to compare itself, unfavorably or otherwise, to industry competitors. Comparison shopping is the responsibility of the reasonable investor.

This brings us to the end of plaintiffs' claim that the disclosures in the prospectus regarding management's ability to service the debt on the bonds were false, misleading and fraudulent. Plaintiffs cannot state a claim for which relief could be granted, and accordingly this part of the complaint is dismissed.

## VI. *Plaintiffs' Second Claim—Competition*

Next, plaintiffs allege that the prospectus failed to adequately disclose the risks to the Taj's success posed by competition in the casino industry. Accordingly, we first examine the statements in the prospectus dealing with such competition.

## A. The Prospectus

The risks of competition are first raised in the "Special Considerations" sub-section entitled "Competition." It is worth excerpting here the entire contents of that sub-section:

**Competition in the Atlantic City casino/hotel market is intense.** At present, there are twelve casino/hotels in Atlantic City, including Trump Castle Hotel & Casino (which is currently undergoing an expansion program) and Trump Plaza Hotel and Casino (which is currently undergoing an extensive refurbishment and renovation program). See "Potential Conflicts of Interest" above. Some Atlantic City casino/hotels recently have completed renovations or are in the process of expanding and improving their facilities. In September 1988, a casino/hotel added 30,000 square feet to its casino floor space and 507 rooms to its hotel capacity. Moreover, another casino/hotel has begun constructing a new hotel tower with approximately 800 rooms, which is scheduled to open in 1989 and which will permit the casino/hotel to add up to 60,000 square feet to its casino floor space. Preliminary plans have been announced for the construction of a new casino/hotel which, if constructed, is expected to open by 1991 and to have approximately 60,000 square feet of casino floor space. Preliminary plans also exist for the construction of two additional casino/hotels, each with approximately 600 hotel rooms and 60,000 square feet of casino floor space, neither of which, if constructed, is expected to open before 1992. In addition, both the Resorts Casino Hotel, which is expected to be renovated, and the Showboat Casino and Hotel ("Showboat") are situated next to the Taj Mahal and will each be connected to the Taj Mahal by an elevated pedestrian walkway. **The Partner-**

ship believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal.

Prospectus at 14 (emphasis added).

Additionally, under "Potential Conflicts of Interest" in "Special Considerations," the prospectus states that "[t]he Trump Casinos compete directly with each other and with other Atlantic City casino/hotels and will compete with the Taj Mahal for casino, hotel and restaurant customers and for convention business." Prospectus at 14.

Considerations of competition in the casino/hotel industry are revisited in the "Management's Discussion" section of the prospectus. In addition to repeating that "[c]ompetition in the Atlantic City casino/hotel market is intense," this section notes that the "Atlantic City Casino industry is currently experiencing a significant increase in capacity, which is generally measured by available casino floor space." Prospectus at 33. After again detailing the various current and anticipated expansions, renovations and future construction in the area, the section continues:

The Taj Mahal would also compete with any casinos in jurisdictions close to New Jersey that may authorize casino gaming in the future. Legislation permitting casino gaming has been proposed, from time to time, in various states. The Partnership also faces competition from casinos located in Nevada, Puerto Rico, the Caribbean and The Bahamas, as well as from other forms of legalized gaming in New Jersey and its surrounding states such as lotteries, horse racing, jai alai and dog racing.

. . . . .

The Partnership believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal. **Growth in Atlantic City win is expected to be restrained** until further improvements to the City's

transportation system and infrastructure are undertaken and completed and the number of non-casino hotel rooms and existing convention space are increased. **No assurance can be given with respect to either the future growth of the Atlantic City gaming market or the ability of the Taj Mahal to attract a representative share of that market.**

**The profitability of the Taj Mahal could be affected by its proximity to the Resorts Casino Hotel, which is being acquired by Griffin Co., and the Showboat,** which is owned and operated by an entity not affiliated with the Partnership. . . .

The Taj Mahal, Resorts Casino Hotel and Showboat are located at the eastern end of the Boardwalk, approximately one-half mile to one and one-half miles to the east of eight other Atlantic City casino/hotels. **The effect of the concentration of the majority of the casino/hotels at the opposite end of the Boardwalk has historically been to attract the gaming patron volume to that area and away from the eastern end of the Boardwalk, where the Taj Mahal will be located. The Partnership believes that the opening of the Taj Mahal and the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal.**

Casinos in Atlantic City must be located in approved hotel facilities which offer dining, entertainment and other guest facilities. Competition among casino/hotels is intense and is based primarily upon promotional allowances; advertising; the attractiveness of the casino area; service; quality and price of rooms, food and beverages; restaurant, convention and parking facilities; and entertainment. **In order to compete effectively with all other Atlantic City casino/hotels, the Partnership intends to offer complimentary drinks, meals, room accommodations and/or travel arrangements to its preferred customers, as well as cash bonuses and other**

**incentives pursuant to approved bus coupon programs.**

Prospectus at 34 (emphasis added).

B. Application of the "Bespeaks Caution" Approach

We begin by commenting on the volume and degree of cautionary language regarding competition. Here again, the prospectus virtually bristles with warnings. And, these warnings are specifically tailored to the purported misrepresentations and omissions.

■ Plaintiffs base their allegation of a cover-up of competitive risks on the prospectus statement that the partnership "believes that the opening of the Taj Mahal in the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal." According to the complaint, this statement violates federal securities fraud laws because it "fails to address the fact that drawing gambling dollars from one casino to another would fail to materially increase the casino win for Taj Mahal on average." Plaintiffs claim that this was materially misleading. However, the prospectus in fact admits that casino wins are expected to decrease in at least the near future, and deliberately offers no assurances of increases in casino wins. Moreover, the challenged statement does not say that the Taj will draw more gaming patrons away from Showboat and Resorts, but merely that the clustering of the three casinos together at that end of the boardwalk could attract more patrons to the *vicinity* of the Taj.

The complaint continues, "[i]n fact, it would cost more money to attract gamblers from one casino to another than would be earned by any increase in business, thereby not increasing the casino win, but rather decreasing it." Again, plaintiffs disregard the very language of the prospectus they seek to challenge. Noting for a third time that competition in the Atlantic City casino industry is intense, the prospectus warns that success is predicated on all sorts of promotional and advertising incentives; and sets forth some of the tactics the Taj will have to employ in order to compete effectively. These include complimentary drinks, meals, room accommodations and travel arrangements for preferred customers. Surely this indicates that effective competition will cost money. As in *I. Meyer Pincus,* here "the prospectus states exactly the 'fact' that [plaintiff] contends has been covered up...." *I. Meyer Pincus,* 936 F.2d at 762.

Plaintiffs also attack the competition disclosures of the prospectus from another angle. They claim that the statement about attracting more patrons to the vicinity of the Taj, Showboat and Resorts was materially misleading because it "failed to disclose the material fact that the opening of the Taj Mahal in the proximity of the Showboat, Trump Castle, Trump Plaza, and Resorts Casino Hotel would materially increase the risk that either the Castle, the Plaza or the Taj Mahal would fail or be unable to service its debt." This failure would allegedly "tarnish" Donald Trump's name and business reputation, further harming the Taj, according to plaintiffs. Complaint, ¶ 38.

This claim also is not actionable. The prospectus warns of the existence of competition among Donald Trump's various casino holdings in Atlantic City: "[t]he Trump Casinos compete directly with each other and with other Atlantic City casino/hotels and will compete with the Taj Mahal for casino, hotel and restaurant customers and for convention business." Therefore, plaintiffs could not establish that the prospectus was fraudulent in failing to disclose the existence of competition among defendant Trump's casinos. Again, the prospectus states the very fact which plaintiffs contend has been omitted. We cannot imagine any language which would more effectively bespeak caution and provide investors with all the information they need to make an independent, reasoned business judgment of their own.

Plaintiffs also claim the prospectus was misleading about competition by alleging that the prospectus "also omitted to disclose the likely effect of the already weakened economy in the Northeast and the

potential for competition from casinos located in Las Vegas, Nevada, principally the Mirage, then under construction." Complaint, ¶ 39. Because the prospectus in fact states that "[t]he Partnership also faces competition from casinos located in Nevada, Puerto Rico, the Caribbean and The Bahamas," we find that plaintiffs could not recover on an alleged failure to disclose risks of competition from Las Vegas casinos. This is precisely the sort of claim to which the "bespeaks caution" doctrine addresses itself. Yet again, the prospectus states exactly the fact that plaintiffs contend was covered up.

█ With respect to the claim that the prospectus omitted to disclose the "already weakened economy in the Northeast," we make two comments. First, the prospectus makes numerous references to the possible ways in which the general state of the economy will affect the success of the Taj and the corresponding ability of the partnership to successfully compete as well as service the debt on the bonds. Thus, "the documents unquestionably warned potential investors *in a meaningful way* that economic conditions in the [ ] industry were uncertain." *Romani*, 929 F.2d at 879 (emphasis added). This renders plaintiffs' allegation not actionable.

Second, there is no obligation under the securities laws for an offering document to set forth information which is widely available to the public and which a reasonable investor ought to be held accountable for knowing. *See, e.g., Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991) ("[n]ews of the labor problems was widely disseminated in the media, locally ... and nationally. There was no duty to divulge anything more for the public about the labor difficulties.") There can be no clearer example of such information than the general state of the economy, particularly a widely-reported recessionary downturn. For this reason as well, this claim is not actionable.

Finally, the complaint makes the bewildering allegation that "[t]he Prospectus in general de-emphasized the business risks involved in operating the Taj Mahal."

Complaint, ¶ 39. Considering all the quoted portions of the prospectus so far included in our opinion, this allegation is indeed the sort for which a motion to dismiss is most fitting.

We find that the prospectus' entire treatment of competition "bespeaks caution" to a striking degree. In the competition claim as well as in the ability to service the debt claim, plaintiffs have attempted to make out a sustainable federal securities fraud case by extracting a single sentence from the entire body of the prospectus, regardless of all other language related to that sentence. Under such circumstances dismissal is required, for even given the most generous reading of their complaint plaintiffs could not recover as a matter of law. Read in context, as it must be, the challenged statement regarding competition is not misleading as a matter of law, and therefore is not actionable. This claim will be dismissed.

VII. *Plaintiffs' Third Claim—Appraisals*

█ Next, plaintiffs challenge the treatment of appraisals of the Taj's value in the prospectus. The prospectus referenced three appraisals of the worth of the Taj. Two of these appraisals, the AGI Current Appraisal and the MGA Current Appraisal, estimated the current worth of the Taj at the time of the bond offering. The complaint does not attack the AGI Current Appraisal and the MGA Current Appraisal. The third appraisal, called the AGI Report, was an estimate or forecast of the future worth of the Taj. The complaint alleges there was inadequate basis for management's reliance on the appraised value of the Taj "as of its opening date in late 1989 or early 1990." We may reasonably infer from this that the allegation is limited to the appraisal of future worth, the AGI Report. The complaint further alleges that while this appraisal was based primarily on the capitalization of income approach, "it was impossible to make any reasonable estimate of the Taj Mahal's future income."

## A. The Prospectus

The "Appraisals" aspect of the "Special Considerations" section contains the following language:

In connection with the acquisition of the Property and the offering of the Bonds, The Trump Organization obtained appraisals from Appraisal Group International ("AGI") and Martin Gross Associates ("MGA"), independent MAI appraisers, reflecting the current market value of the Property.... The Trump Organization also obtained a report from AGI ("the AGI Report") which states that the appraised market value of the Property, as of December 1, 1989, on the assumption, among other things, that the Taj Mahal is fully completed and open to the public as an operating casino/hotel on or about December 1, 1989 is $1,100,000,-000.

....

**Appraisals are estimates or opinions of value and cannot be relied upon as precise measures of value or worth. In addition, the appraisal in the AGI Report is an estimate of the market value of the Taj Mahal at a future date. The amount that the Partnership might realize from the sale of the Property may be more or less than its appraised market value, depending on its then current and anticipated uses, and zoning, financial, economic, market and other conditions that may affect a property's value. Moreover, the appraised market value does not reflect what might be realized upon liquidation of the Taj Mahal or the sale of the Taj Mahal in a distress sale.**

Prospectus at 17 (emphasis added).

Appraisals are revisited in "Management's Discussion." In the section entitled "Properties of the Partnership," there is a sub-section specifically dealing with appraisals. It again describes the three appraisals, and repeats verbatim the cautionary language that appraisals "are estimates or opinions." Prospectus at 39. Additionally, the prospectus states that "[i]n the opinion of the appraisers, the appraisals, which are subject to certain assumptions and qualifications, were prepared in conformity with the guidelines regarding appraisal procedures set forth in regulations governing Federal savings institutions." Prospectus at 39. The appraisers "employed three recognized methods of valuation ..., the cost approach, the comparable sales approach, and the capitalization of income approach, [but] gave primary importance to the capitalization of income approach." Prospectus at 40, 41. And it was again noted that the future appraisal, the AGI Report, "is an estimate of the market value of the Taj Mahal as of a future date and there can be no assurance that the Taj Mahal could be sold at any time, in a foreclosure sale or otherwise, for an amount equal to or exceeding its then appraised value." Prospectus at 41.

## B. Application of the "Bespeaks Caution" Approach

Our analysis here mirrors the analysis undertaken regarding plaintiffs' other claims. First, we find that the citations in the prospectus to the AGI Report bespeak caution in a prominent, specific way. The very text of the prospectus again supports this finding. Next, we recall that "[e]conomic projections are not actionable if they bespeak caution." *Sinay*, 948 F.2d at 1040. Accordingly, plaintiffs claims to the extent they are based on management's reliance on the AGI Report are not actionable.

This claim appears to be yet another attempt to hold defendants liable for fraud by hindsight. "In essence [plaintiff] speculates that defendants committed fraud based solely on the partnership's failure to be as profitable as the offering materials indicated was possible." *Romani*, 929 F.2d at 880. However, as previously discussed, fraud by hindsight is not actionable under federal securities laws. Nor have plaintiffs provided any factual basis for their allegation that there was no reasonable basis for the AGI Report's conclusion that the Taj could at a future date be worth $1.1 billion. As we noted earlier, no inference of fraud can be drawn from conclusory

allegations devoid of factual basis. *See DiLeo, supra.* Therefore, this claim will be dismissed.

## VIII. *Plaintiffs' Fourth Claim—Donald Trump's Financial Status and His Obligations to the Bondholders*

■ The complaint alleges that false and misleading omissions and statements with respect to defendant Donald Trump's financial status and obligations appeared in two forums: the prospectus, and also various media news sources. These present different issues we will treat *seriatim.*

The crux of plaintiffs' claim here is that both the prospectus and the statements reported in the media failed to disclose that Donald Trump's financial condition was less than stable, and omitted to state that the Taj would suffer and be incapable of servicing the debt on the bonds if his financial condition or reputation were "tarnished." The complaint also alleges that the prospectus failed to disclose the capital contribution Donald Trump was obligated to make to the Taj funding plan, and that the amount of his contribution left the Taj heavily leveraged.

### A. The Prospectus

In the "Special Considerations" sub-section entitled "Trump Completion Guaranty," the prospectus notes that while "Donald J. Trump will covenant, agree and guarantee that the construction of the Taj Mahal will be substantially completed by March 1, 1991, ... Donald J. Trump will not, under any circumstances, be obligated under the Trump Completion Guaranty or the Trump Line of Credit to pay the principal of, premium, if any, or interest on the Bonds...." Prospectus at 13.

In the "Management's Discussion" portion of the prospectus, it is stated:

> Donald J. Trump has advised the Partnership and the Company that he has sufficient financial resources to perform his obligations under the Trump Completion Guaranty. He has further advised the Partnership and the Company that his net worth, determined in accordance with generally accepted accounting principles applicable to personal financial statements, is at least $500,000,000. In computing such net worth, assets and liabilities are stated at their estimated current values and amounts. Depending upon the circumstances under which assets are liquidated, Donald J. Trump may or may not be able to realize the fair market value of such assets. A substantial portion of Donald J. Trump's assets consist of real property or interests in regulated enterprises, which may affect the liquidity of such assets.

Prospectus at 68.

### B. Application of the "Bespeaks Caution" Approach and Other Considerations

Plaintiffs allege that the prospectus did not disclose that Donald Trump intended to or was spending millions of dollars on ventures other than the Taj; and that this was misleading because it failed to inform investors that his financial condition was shaky, and that this could harm the Taj. However, we are constrained to point out that Donald Trump's obligations under the Taj financing deal were unequivocally set forth in the prospectus. His capital contribution obligation was limited to a $75 million amount. The prospectus stated that Donald Trump could make good on this obligation, and he in fact did so. Plaintiffs do not allege, nor could they allege, that he did not make the $75 million contribution. How Donald Trump expended his own funds above and beyond the $75 million was irrelevant to the Taj deal. As the very language of the prospectus makes explicit, he was not a personal guarantor of the Taj's success. Accordingly there was no requirement to disclose information as to how he would manage that portion of his net worth in excess of the $75 million capital contribution. Indeed, we can discern no requirement for the disclosure of his precise personal net worth at all, other than perhaps to further assure bondholders he could perform his obligations to the partnership.

Furthermore, as a matter of law, this claim is too attenuated to be actionable.

The connections which plaintiffs seek to draw are beyond the bounds of management's responsibility to disclose. The "undisclosed fact" that any tarnish to Donald Trump's financial reputation could be reflected in the prosperity of the Taj is in reality an inference which any reasonable investor, given the disclosures made in the prospectus and the well-known, widely-reported public prominence of Donald Trump, could have made independently. The disclosure requirements of section 11 and 10b do not anticipate a duty by management to draw inferences for investors. Again, the object of the securities fraud laws is disclosure, not business judgment. Business judgment, including inferences drawn from fully-disclosed information, rightly remains the province of individual investors.

Prominent and specific information in the prospectus also renders not actionable plaintiffs' spurious allegation that Donald Trump's guarantee of $75 million "indicated greater leverage on the Taj Mahal than investors and the Purchaser Class were led to expect from the Prospectus." As discussed *supra*, in connection with plaintiffs' Taj funding claim, the prospectus set forth the entire financing structure of the Taj, including Donald Trump's capital contribution. Bond purchasers knew that the bonds were worth $675 million, and that the total capital contribution was far less than that amount. The prospectus thus set forth the very fact which plaintiffs' allege was covered up, the degree to which the Taj was leveraged. This is indeed beyond the bounds of bespeaking caution.

 Finally, the allegation that the prospectus disclosure of Donald Trump's net worth as $500,000,000 was false and misleading is also not actionable. Although plaintiffs state in their complaint that the net worth was based on artificially inflated appraisals and the financial statements relied upon were not prepared in accordance with generally accepted accounting principles, there is again no factual basis for these claims. *See DiLeo, supra.* And in any event, the complaint bespeaks caution

in the manner in which it presents the net worth appraisal: it warns that the net worth is based on estimated values of assets, which may not be realized in the event of liquidation at some future date. Thus, the disclosure about Donald Trump's net worth, which is notably nothing more than another future projection, is directly addressed by narrowly-tailored cautionary language. Plaintiffs could not recover on this claim, and therefore it must be dismissed.

### C. The Statements Reported in the Media

 The complaint cites various media sources, such as the *Wall Street Journal, Newsweek* and *Forbes*, alleging that certain statements reported in these sources form the basis for a federal securities fraud claim.[11] In the statements at issue, Donald Trump reportedly remarked, *inter alia*, that the Taj would be a tremendous success, that his net worth was four or five billion dollars, that he wanted to become the "king of cash," and that he denied having cash flow problems. Plaintiffs argue that these statements are actionable. We disagree.

Defendants argue several bases for dismissing this claim. However, we need only remark that every statement listed in the complaint was made, according to the dates given by plaintiffs themselves, during 1989 and 1990. The bonds were issued in 1988, and plaintiffs admittedly purchased their bonds before 1989. Plaintiffs cannot rely on statements made subsequent to their purchases in order to state a securities fraud claim, because plaintiffs could not have relied on the statements in making their purchases in the first place. *See Schwartz v. Novo Industri A/S,* 658 F.Supp. at 795. "[N]o liability attaches to statements made after the transaction [and t]herefore [plaintiff's] allegations regarding after-made statements do not state a claim." *Stevens v. Equidyne Extractive Industries,* 694 F.Supp. 1057, 1064 (S.D.N.Y.1988).

---

11. Plaintiffs did not attach to the complaint copies of the articles from which they quoted.

██ Plaintiffs respond that they represent a putative class, potential members of which may have purchased bonds subsequent to, and in reliance on, these statements. This response fails to persuade us. The named plaintiffs could not represent a class which included bondholders who purchased after these statements were printed, as all of the named plaintiffs purchased prior to circulation of those statements. Thus the named plaintiffs here would not be "similarly situated" to such potential class members, and could not adequately represent their interests. "The fact that a case is brought as a class action does not change the calculus; named plaintiffs 'cannot represent a class of whom they are not a part.'" *Haft v. Eastland Financial Corp.*, 772 F.Supp. 1315, 1316 (D.R.I.1991) (citations omitted). Accordingly, plaintiffs cannot state a claim upon which relief could be granted based on these media statements, and the claim must therefore be dismissed.

This disposes of all plaintiffs' substantive claims for relief in the complaint. Because no claim is actionable, for the reasons set forth herein, the federal securities fraud claims will be dismissed in their entirety.

## IX. *Plaintiffs' Request to Amend the Complaint*

██ In defending against this motion to dismiss, plaintiffs have supplied this court with numerous materials outside the pleadings. One of these is a document entitled the "Laventhol Report," a future appraisal of the Taj which is not referenced in the prospectus. We have held that these materials, including the Laventhol Report, are not to be considered as part of this motion to dismiss.

However, plaintiffs have requested leave to amend their complaint as an alternative to dismissal.[12] While leave to amend is generally to be liberally granted, *see Pancza v. Remco Baby, Inc.*, 761 F.Supp. 1164 (D.N.J.1991), it should not be granted if such an amendment would be futile. *See Sinay*, 948 F.2d at 1041–42; *Massarsky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). That is to say, if the amendment could not survive a motion to dismiss, then leave to amend will not be granted. Accordingly, in considering plaintiffs' request for leave to amend, we must also consider the additional materials they have submitted, on the assumption that these materials would be the basis of any proposed amendment.[13]

Of particular import in this case is the restriction that "[a]mendments relating to projections or expectations offered to induce investments must allege particular facts demonstrating the knowledge of defendants at the time that such statements were made." *Luce*, 802 F.2d at 57. We examine plaintiffs' submissions in light of this standard.

First and foremost is the Laventhol Report. Prepared by the accounting firm of Laventhol and Horwath in 1987, the Laventhol Report was commissioned by Resorts

---

**12.** In fact, plaintiffs have not complied with our local rules concerning motions for leave to amend a complaint. Plaintiffs have merely noted in their opposition brief their opinion that "[e]ven if the Complaint is held to be defective, any defects can be easily remedied," and cited in a footnote to the proposition that leave to amend a complaint is to be freely given pursuant to Fed.R.Civ.P. 15(a). However, New Jersey Federal Practice Rule 12 H provides that a motion to amend is to be filed, together with "a copy of the proposed pleading or amendments...." Plaintiffs neither filed a motion, nor attached to their brief any proposed amendment, thus leaving us without guidance as to how they would amend their complaint if granted leave. Despite the procedural irregularities, in the interests of justice we will consider plaintiffs' request as a formal motion to amend.

This requires us to extrapolate from plaintiffs' submissions the substance of any amendment to their complaint.

**13.** In fact, at oral argument counsel for plaintiffs effectively withdrew any request for amendment, stating that the complaint could stand on its own as is, without any need for revision. It is well settled that it is not an abuse of discretion for a district court to refuse to grant amendment where amendment is not sought. *See, e.g., Romani*, 929 F.2d at 880–881. However, in the face of conflicting messages from plaintiffs and the submission of additional materials, and adhering to our duty to draw all reasonable inferences in plaintiffs' favor, we will consider amending the complaint.

International, Inc., the original developer of the Taj project. It was issued in September 1987, prior to commencement of the deal which transferred ownership of the Taj to Trump. The following language was included in the introductory letter to the report: "Our report is intended solely for the information of the officers, directors and shareholders of Resorts International, Inc. and, if desired, the Casino Control Commission of New Jersey. Otherwise, neither this report nor its comments may be referred to or quoted in any registration statement, prospectus, . . . or document without our prior written consent." Plaintiffs' Exhibit A at 2.

The Laventhol Report's projections of future income and cash flow for the Taj Mahal differ markedly from the AGI Report projections included in the prospectus. Indeed, the Laventhol Report projections, as it has turned out, mirror more accurately the actual economic performance of the Taj. However, these points cannot in themselves serve as the basis of an amended complaint which could survive another 12(b)(6) motion. First, the Laventhol Report is at most independent evidence that might tend to show that the AGI Report referenced in the prospectus was false and misleading. But it is not factual support for the allegation that there was no reasonable basis for reliance on the AGI Report. Furthermore, defendants were under no obligation to include the Laventhol Report projections in the prospectus. Management is not required by the securities fraud laws to disclose other companies' papers. Compliance with the disclosure requirements, if such a burden were imposed, would border on the impossible.

Neither were defendants authorized to include the Laventhol Report in the prospectus, as evidenced by the restrictions indicated on the face of the report itself. And, this is assuming that defendants even had knowledge of the Laventhol Report when preparing the prospectus, as it was prepared solely for Resorts. In short, the Laventhol Report was neither prepared for use in a prospectus, nor authorized for reference in a prospectus, nor commissioned by defendants, nor even commissioned by Resorts with the sale to Trump in mind.

Moreover, the cover letter to the Laventhol Report stated that the report relied on assumptions, some of which "inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, any actual results achieved during the period of the prospective analyses will vary from the estimates, and the variations may be material." Plaintiffs' Exhibit A at 2. This kind of qualification is substantively no different from the sort of cautionary language which appeared in the prospectus regarding the AGI Report. Indeed, plaintiffs own complaint indicates that the Laventhol Report could not correct the deficiencies we have highlighted in this opinion. Plaintiffs claim that at the time the prospectus was filed, "it was impossible to make any reasonable estimate of the Taj Mahal's future income." How, then, can the Laventhol Report have been a reasonable estimate of future worth any more than the attacked AGI Report? It is clear that introduction of the Laventhol Report into the complaint would do nothing more than attempt to establish, yet again, fraud by hindsight. For the reasons discussed *supra*, such a claim is not actionable.

Finally, the Laventhol Report itself, even without the defects we have listed here, is insufficient to support a securities fraud claim. Were the complaint amended to include the Laventhol Report, still it would "offer[ ] no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial determinations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud." *DiLeo*, 901 F.2d at 627. We are faced with yet another example of fraud by hindsight rearing its ugly head. Thus, and for all the reasons enumerated here, no amendment based on the Laventhol Report could survive dismissal.

Plaintiffs' remaining submissions require only cursory comment. An affidavit by Peter R. Tyson, of Laventhol and Horwath,

testifies that the Laventhol Report was commissioned by Resorts "because they were mapping corporate strategy." Plaintiffs' Exhibit C at 3. This in fact corroborates our view that defendants had no obligation to rely on projections solicited by another corporate entity for entirely different purposes in the past. The affidavit also attempts to gloss over the use which plaintiffs seek to make of the Laventhol Report: one of the scenarios anticipated in the report envisioned Resorts continuing to operate the Taj while selling off Resorts International Casino and Hotel to other management, and plaintiffs argue that this situation happened "in reverse," with the Taj instead being sold off and operated by the Trump defendants. However, this also corroborates defendants' fraud by hindsight defense, for if the Laventhol Report stated it was speculative how the Taj would perform under Resorts' management, it was even more speculative how it would perform under other management, whether defendants or any other potential buyer.

Another document, a deposition transcript which purports to speak to Merrill Lynch's due diligence as the underwriter, is irrelevant, as we have not had to reach that issue in dismissing the complaint. The remaining documents similarly do not contain facts demonstrating the knowledge of defendants at the time the alleged misrepresentations were made, or anything which could alter our conclusions reached in this opinion.

Accordingly, plaintiffs' questionable request to amend is denied, and our dismissal of the complaint is with prejudice.

## X. *Pendent State Law Claims*

Because plaintiffs' federal claims will be dismissed in their entirety, we cannot retain jurisdiction over the pendent state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218

(1966). Accordingly, the pendent claims for breach of fiduciary duty and false advertising will be dismissed without prejudice.

## XI. *Conclusion*

Our ruling here is based on our belief that plaintiffs should not be permitted to distort the plain meaning of the prospectus in order to state a claim, or to rely on isolated statements buried in the midst of the document while overlooking prominent, conspicuous warnings at the beginning of the document as well as immediately surrounding the challenged statements. Neither can plaintiffs base a securities fraud claim on an attempt to "rewrite" the prospectus in order to phrase the cautionary language in terms they find more suitable but without any practical difference in effect, nor on allegations of fraud by hindsight, nor on allegations of securities fraud devoid of factual basis. Because these very defects represent the essence of plaintiffs' complaint, and because they are not amenable to correction by an amendment, the complaint is dismissed with prejudice.[14]

An appropriate order will be entered.

## ORDER

This matter having come before the court upon motion of defendants Donald J. Trump, Robert S. Trump, Harvey S. Freeman, The Trump Organization, Inc., Taj Mahal Funding, Inc., Trump Taj Mahal Inc. and Trump Taj Mahal Associates Limited (collectively "the Trump defendants"), and of defendant Merrill, Lynch, Pierce, Fenner & Smith for dismissal pursuant to Fed. R.Civ.P. 12(b)(6), and the court having considered the submissions, and for good cause shown;

It is, this 2nd day of June, 1992, hereby ORDERED that defendants' motion is

---

**14.** Finally, we feel obliged to note the pendancy of a motion to disqualify plaintiffs' co-lead counsel, Richard Greenfield, as class counsel, and his client, Fairmount, as a class representative. The basis of this motion to disqualify is Mr. Greenfields and Fairmount's alleged conflicts of interest between this litigation and litigation involving Trump's Castle Casino & Hotel and Trump's Plaza Casino & Hotel. The motion to disqualify in no way impacts upon this motion to dismiss. The presence or absence of either Mr. Greenfield or Fairmount does not alter in any way the substantive and controlling issues which dictate the result reached here.

GRANTED, and the complaint is hereby DISMISSED with prejudice.